HENDERSON, Administrator, Office of Price Administration, v. C. THOMAS STORES, Inc., et al.

No. 812.

District Court, D. Minnesota, Fourth Division.

Nov. 24, 1942.

David Ginsburg, General Counsel, and Brunson Mac Chesney, Asst. Gen. Counsel, both of Washington, D. C., Alex Elson, Regional Atty., and John F. Manierre, Regional Enforcement Atty., both of Chicago, Ill., and William L. Prosser, State Counsel, John M. Palmer, State Enforcement Atty., and Donald F. Pratt, Senior Enforcement Atty., all of Minneapolis, Minn., for plaintiff.

R. H. Fryberger, of Minneapolis, Minn., for defendants.

NORDBYE, District Judge.

The above-entitled cause came before the Court on plaintiff's application for a preliminary injunction. The application is based on the verified bill of complaint and on the affidavits and exhibits thereto attached. Defendants' response consists of an affidavit by E. H. Rasmussen, together with the exhibits attached, and the oral testimony of L. W. Bailey and E. H. Rasmussen.

Plaintiff seeks to restrain the defendants

"(a) from selling or delivering any groceries, food or other commodities subject to the General Maximum Price Regulation at prices in excess of the maximum prices permitted by the General Maximum Price Regulation, as heretofore or hereafter amended or supplemented;

"(b) from failing or refusing to prepare and preserve for examination, by any person, during business hours, a complete and accurate statement showing prices which they, or either of them, charged for such of those commodities, as they, or either of them, delivered or supplied during March, 1942, and their, or either of their, offering prices for the delivery or supply of such commodities during such

month, together with an appropriate description or identification of each said commodity, and their, or either of their, customary allowances, discounts or other price differentials;

"(c) from failing or refusing to preserve for examination by the Office of Price Administration, all existing records relating to the prices which they, or either of them, charged for such of those commodities they, or either of them, delivered or supplied during the month of March, 1942, and their, or either of their, offering prices for delivery or supply of such commodities during such month;

"(d) from failing· or refusing to keep and make available for examination by the Office of Price Administration, records customarily kept by them, or either of them, relating to the prices which they, or either of them, charged for such of those commodities as they, or either of them, sold after May 18, 1942, and in addition records showing, as precisely as possible, the basis upon which they, or either of them, determined maximum prices for those commodities;

"(e) from failing or refusing to prepare and file with their, and each of their, appropriate War Price and Rationing Board of the Office of Price Administration, a statement showing their, or each of their, maximum price for each cost-of-living commodity as referred to and described in said General Maximum Price Regulation, together with an appropriate description or identification of such commodity; and from failing or refusing to keep said statement up to date by filing a statement of their, and each of their, maximum prices for new cost-of-living commodities, newly offered for sale during the previous month, together with an appropriate description or identification of such commodity;

"(f) from failing or refusing to mark the maximum price of each cost-of-living commodity sold at retail, in a manner plainly visible to and understandable by the purchasing public;

"(g) from otherwise failing or attempting, or agreeing to do anything whatsoever, in violation of said General ·Maximum Price Regulation, as heretofore or hereafter amended or supplemented."

The bill of complaint sets forth various violations between May 18, 1942, and September 18, 1942, of the General Maximum Price Regulation promulgated under Section 2(a) of the Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 902 (a). The relationship between the parties and the manner of doing business should be briefly related. The C. Thomas Stores, Inc., hereinafter referred to as the Stores Company, is engaged in the sale of groceries, food and other merchandise through some 62 stores located in the State of Minnesota. All of the stores are owned and operated by this company, with local managers in charge of each operation. The Mutual Wholesale Food & Supply Company, hereinafter referred to as Mutual, is primarily engaged in the sale at wholesale to the Stores Company of all the merchandise and commodities which are sold by that company. All of such merchandise is sold to the Stores Company on consignment, and Mutual remains the owner until the sales have been consummated by the Stores Company. Settlements are made daily by the Stores Company for all merchandise sold since the previous day's accounting. Mutual determines the retail price for which all merchandise sold by it shall be disposed of by the Stores Company. It appears that the merchandise is paid for by the Stores Company on the basis of cost plus and cartage charges. Furthermore, Mutual and the Stores Company are closely allied. Mutual was organized for the purpose of buying merchandise at wholesale for disposition to the Stores Company. With the exception of a very few independent merchants, the sole customer of Mutual is the Stores Company. Defendant L. W. Bailey is President and General Manager of Mutual, and Treasurer and General Manager of the Stores Company; L. W. Houston is President of the Stores Company; T. B. Koehler is Vice President of the Stores Company; R. L. Messick is Secretary of Mutual; and E. H. Rasmussen is buyer and manager of the purchasing department of Mutual. The other individual defendants are managers of the various local stores.

Each of the grocery stores operated by the Stores Company is designated as a Zone A, Zone B, or Zone C store. The Zone A stores are large, self-service stores, usually located at a desirable corner or other advantageous location in the larger cities. The Zone B stores are other city stores, and the Zone C stores are the so-called country stores located outside of the cities. Generally speaking, in absence of

local competition as to certain individual items, it had been the practice and the custom of the defendant Stores Company for several years prior to March, 1942, by reason of the services available to the customers and other circumstances, to maintain uniform prices in all the stores in the same zone, but higher prices were maintained in the C zone than in the B zone, and in the B zone than in the A zone. It is the position of the plaintiff that, under the Act and regulations, the maximum prices permitted for merchandise sold by the stores in any particular zone during March, 1942, are the highest prices for which such merchandise can be sold by the stores in that particular zone after March 31, 1942. In other words, in determining the maximum prices to be charged under the Act by a store in the A zone, such store could not base its charges on the maximum prices charged during March, 1942, for any particular commodity in a B zone store. That this position is sound seems free from doubt, and it is expressly sustained and supported by the regulation promulgated on April 28, 1942, commonly referred to as Bulletin No. 1. Under Section 20 of the reprint entitled "Definitions and Explanations," is found the following (p. 13):

"(s) Seller: 'Seller' includes a seller of any commodity or service. Where a seller makes sales or supplies services through more than one selling unit, other than salemen making sales at uniform prices, each separate place of business of the seller shall be deemed to be a separate seller * * *."

Under General Maximum Price Regulation Bulletin No. 2, entitled "What Every Retailer Should Know About the General Maximum Price Regulation," issued in May, 1942, by the Office of Price Administration, there appears on page 4 of the reprint the following interpretation: "1. Each store in a group of chain stores is considered as a separate retailer and must determine its own ceiling prices."

■ Any other construction or interpretation of the Act in this regard would tend to defeat its very purpose. The prices charged in the Zone C stores are markedly higher than those which prevail in the super-markets where the customer serves himself. No good reason is suggested why the system adopted by the retailer should not prevail in the application of the regulations. It is common knowledge that there are some chain store companies which operate over the entire Nation. Obviously, if the purposes of the Act are to be achieved, the maximum prices charged by a chain store in one section of the country cannot be accepted as a prevailing March, 1942, price in a store owned by the same chain located hundreds of miles away and where entirely different conditions and circumstances prevail. It is no answer to assert that the chain stores should be considered as a unit under legislation designed to control inflation because such organizations are so considered for the purposes of taxation and in the application of other regulatory measures promulgated by the Government. The present Act is a war measure designed to check an enemy to our economic welfare. No greater hardship rests on the chain-store operator under this ruling than that which befalls the individual store owner, and the Administrator, in promulgating the regulation and ruling, is only giving effect to a situation which the Stores Company herein has itself established and maintained for very evident reasons. In passing, it may be of interest to observe that, where legislation which inhibited sales below cost was being considered, a large chain-store operator took the position that the Act was unfair and illegal, and in this regard was upheld, because the legislation sought to make all stores owned by one owner a unit for determining selling prices so far as such prices were dependent upon selling costs. Great Atlantic & Pacific Tea Company v. Ervin, D.C., 23 F.Supp. 70.

Section 1(a) of the General Maximum Price Regulation (April 28, 1942) provides in part: "No person shall sell or deliver any commodity, and no person shall sell or supply any service, at a price higher than the maximum price permitted by this Regulation; * * *."

Section 2 of such Regulation provides in part:

"Except as otherwise provided in this Regulation, the seller's maximum price for any commodity or service shall be:

"(a) In those cases in which the seller dealt in the same or similar commodities or services during March, 1942:

"The highest price charged by the seller during such month—

"(1) For the same commodity or service; or

"(2) If no charge was made for the same commodity or service, for the similar commodity or service most nearly like it; or

"(b) In those cases in which the seller did not deal in the same or similar commodities or services during March, 1942:

"The highest price charged during such month by the most closely competitive seller of the same class—

"(1) For the same commodity or service; or

"(2) If no charge was made for the same commodity or service, for the similar commodity or service most nearly like it.

### " 'Highest Price Charged During March 1942'

"For the purposes of this Regulation, the highest price charged by a seller 'during March, 1942' shall be:

"(1) The highest price which the seller charged for a commodity delivered or service supplied by him during March, 1942; or

"(2) If the seller made no such delivery or supplied no such service during March, 1942, his highest offering price for delivery or supply during that month."

The principal violations charged by the plaintiff with respect to sales may be grouped into the following classes or types:

1. That the defendant Stores Company has increased its prices over the maximum March, 1942, selling prices with respect to quantity or group purchases and has refused and neglected to allow the price differential prevailing in March, 1942, where group purchases are made.

2. That where Mutual has, as it avers, obtained advantageous purchases before March 1, 1942, of various commodities resulting in the Stores Company's being able to sell at a low retail cost to its customers, and when purchases were made for the same commodities subsequent to March 31, 1942, Mutual was required to pay a higher price, it is contended that, under these circumstances, Mutual and the Stores Company assumed to pass on the increase to the consumer even though the retail price charged by the Stores Company would exceed the price charged for such commodity by the Stores Company during the month of March, 1942, without obtaining permission from the Administrator as required by the Act.

3. Where particular goods or commodities during the period in question were not handled by the retail stores in March, 1942, plaintiff asserts that the selling price of such commodities was not computed in accordance with Section 3 of the General Maximum Price Regulation, and it is further claimed that defendants failed to comply with said section in advising the Office of Price Administration as to the determination of such maximum price by the retailer.

4. That there are certain instances where Mutual and the Stores Company concede that, through error or oversight, prices charged by Mutual to the Stores Company, and by the Stores Company to its retail customers, exceed the maximum prices charged for such commodities in the month of March, 1942.

5. That defendants have failed and neglected to comply with the posting provisions of the regulation relative to maximum prices of cost-of-living commodities, the preparation of base period records and current records, and kindred requirements.

These alleged violations will be considered in the order indicated above.

I. It appears that, for some time prior to and including the month of March, 1942, the retail stores in the various zones quoted prices on, and sold to their customers, commodities at discount prices where more than one article was purchased. These group purchases at a special price were not maintained for all articles in the store, but did pertain to various types of canned goods, soap and other merchandise. The prices for any given number might, and frequently did, vary, depending upon the zone in which the store was located. For instance, soap might be offered and sold in a certain store in the A zone at three bars for 19 cents; in a C zone store the price might be 7 cents straight, regardless of the quantity purchased. Subsequent to March 31, 1942, however, the same store which sold three bars of soap for 19 cents was instructed by Mutual to sell the same commodity at a price of three bars for 20 cents. Other brands of soap were sold in March at two bars for 13 cents, and subsequent to March 31st the same store would be instructed to sell the soap at three bars for 20 cents. Instances of this kind might be greatly multiplied where price differentials for quantity purchases after March 31st did not result in

a lower price to the customer, but in fact a higher price. A reading of the regulations of April 28, 1942, leaves no doubt as to the duty of the retailer where discounts had been allowed during March, 1942, for quantity purchases. Section 2 of the General Maximum Price Regulation Bulletin No. 1 provides in part:

"No seller shall change his customary allowances, discounts or other price differentials unless such change results in a lower price. The 'highest price charged' shall be a price charged during March, 1942, to a purchaser of the same class."

Section 20, Definitions and Explanations, and sub-section (k) thereof entitled "Purchaser of the Same Class" provides in part: "'Purchaser of the same class' refers to the practice adopted by the seller in setting different prices for commodities * * * or for purchasers located in different areas or for different quantities or grades or under different conditions of sale."

A subsequent bulletin of the Office of Price Administration, issued in May, 1942, in citing examples as to how Section 2 (a) (1) of the General Regulation should be interpreted, recites on page 5 of the reprint the following: "6. A brand of soap was delivered by a retailer all during March at 10 cents each, three for 25 cents. The maximum price at which the soap may be sold after May 18 is 10 cents each, three for 25 cents. The retailer must continue to allow his customary discount for quantity purchases."

But defendants urge that, where a commodity is sold three for 20 cents, for instance, then the unit price is 7 cents, and that being the maximum price charged in March, such maximum may be reflected in any quantity sales which are made subsequent to March 31, 1942. True, under the example cited where a customer only purchases one item, the seller could charge 7 cents and that price would be the maximum price for a single unit which might be purchased after March 31st. If, however, effect is to be given to the plain intent of the regulations where quantity discounts were given on the sale of any certain commodity, the seller cannot change the price differential on quantity purchases of the same commodity unless "such change results in a lower price." This the defendants have failed to do, and where such group purchase discounts

after March 31, 1942, have resulted in a higher price to the purchaser, the Act has been violated.

II. Some of the variances between the maximum March, 1942, price and the selling price during the period between May 18, 1942, and September 18, 1942, is due to the fact that Mutual and the Stores Company arbitrarily raised the maximum price permitted under the law in order to absorb the higher purchase price which it is claimed Mutual was required to pay to its seller after March 31, 1942. That is, the defendants contend that retail prices as to certain items were abnormally low in March due to advantageous purchases made by Mutual. Later, it is contended that, in replacing these stocks with the same items after March 31, 1942, the same advantageous purchases could not be obtained by Mutual, and hence the raise over the market price to the stores and to the ultimate consumer. The situation is characterized by Mutual and the Stores Company as being "caught in the squeeze." They assume to justify the increase over the March maximum for that reason.

It is apparent from the interpretation of the Administrator (p. 20, reprint Bulletin No. 2, May, 1942) that a wholesaler can charge a retailer the maximum price it charged to any retailer of that class for the same goods during March. It is not necessarily the "highest price" which any particular retailer was charged by the seller in March, because if the seller charged a higher price to other retailers of the same class, then that selling price would be the maximum price which would govern the wholesaler. Presumably, therefore, that interpretation applies to the wholesaler or jobber which supplied Mutual. Consequently, if Mutual obtained an advantageous purchase from a particular wholesaler so as to permit a reduction in the retail price maintained by the Stores Company, a purchase of the same commodity from the same wholesaler after March might result in a higher price to Mutual, but notwithstanding the apparent inequity of requiring Mutual and the Stores Company to maintain the March selling price under such circumstances, the Act does not contemplate that the retailer shall assume the authority to adjust such inequity without permission of the Office of Price Administration. Section 18 of the General Maximum Price Regulation Bulletin No. 1, April 28, 1942, provides:

"(a) Any seller at retail who finds that the maximum price of a commodity or service established for him under the provisions of sections 2 or 3 of this Regulation is abnormally low in relation to the maximum prices of the same or similar commodities or services established for other sellers at retail, and that this abnormality subjects him to substantial hardship, may file an application for adjustment of that maximum price in accordance with procedural regulations which will be issued by the Office of Price Administration.

"(b) Any seller at retail who finds that his maximum price for any commodity, and the maximum prices of other retail sellers for the same commodity are abnormally low in relation to the level of maximum prices established by this Regulation for wholesalers, manufacturers or producers of such commodity, and that this relationship subjects sellers at retail of such commodity generally to substantial hardship, should immediately communicate such information in writing to the Retail Trade and Services Division, Office of Price Administration, Washington, D. C., so that the Price Administrator may take appropriate action."

■ The defendants Mutual and Stores Company, however, made no application for adjustment, and in attempting to adjust the alleged inequity in their own way, they both violated the Act.

■ III. The Act provides that, when any particular commodity or commodities were not handled in March, a certain formula should be followed in order to obtain the seller's maximum price for such commodities. Such formula is to be found in Section 3, General Maximum Price Regulation Bulletin No. 1, which provides in part:

"The seller's maximum price for a commodity which cannot be priced under section 2 of this Regulation shall be a maximum price in line with the level of maximum prices established by this Regulation. Such price shall be determined by the seller in accordance with the following procedures:

"(a) Sales at wholesale or retail. In the case of a sale at wholesale or retail, the seller (1) shall select from the same general classification and price range as the commodity being priced under this section, the comparable commodity for which a maximum price is established under section 2 of this Regulation and of which the seller delivered the largest number of units during March, 1942; (2) shall divide his maximum price for that commodity by his replacement cost of that commodity; and (3) shall multiply the percentage so obtained by the cost to him of the commodity being priced under this paragraph. The resulting figure shall be the maximum price of the commodity being priced. Within ten days after determining such maximum price under this paragraph, the seller shall report such price to the appropriate field office of the Office of Price Administration upon a form, duly filled out and signed under oath or affirmation, copied from the form contained in Appendix A of this Regulation. The price so reported shall be subject to adjustment at any time by the Office of Price Administration."

It is evident from defendants Mutual and Stores Company's explanation of the method adopted by them in determining the maximum prices for commodities not handled in March, no attention whatsoever was paid to the above quoted regulation. Not only did they neglect to follow the formula prescribed, but no report of the maximum price thus fixed was sent to the appropriate field office of the Office of Price Administration. These defendants, however, content themselves with stating that there is no evidence or showing herein that the price which they did adopt exceeded the retail price which would have been obtained if the formula had been followed. This may be true, but no excuse is suggested for the violation of the Act with respect to their failure to report such price to the appropriate field office. The same observation may be made as to the instances where Mutual and the Stores Company arbitrarily raised their prices without notice to, or permission from, the Administrator where it is contended that concessions had been made by the proper authorities under the Act to the sellers of certain commodities to Mutual, resulting in a higher selling price to Mutual after March 31, 1942. These regulations, and the bulletins interpreting them, were mailed to these defendants, and their managing officers were conversant with such regulations and requirements shortly after their promulgation. Even a cursory examination of Bulletin No. 1 would indicate the duty of a retailer under such circumstances.

IV. The officers and agents of Mutual and the Stores Company have admittedly, either through error, misunderstanding, or inexcusable carelessness, sold a variety of commodities above the March maximum price, and which sales are not to be found in the groups or categories above referred to. Some of the increases have been very minor in character, but in other instances appreciable increases appear over the maximum price permitted by law. Mutual and the Stores Company contend that such violations occurred through error and oversight, and assume to excuse their derelictions because of the newness of the legislation and its many ramifications. One should not be unmindful of the fact that some 1,500 to 1,800 different items are sold by the Stores Company, and further, that the selling prices in the stores in the respective zones are very apt to vary. Undoubtedly, to supervise these establishments and abide by all of the provisions of the Act and regulations pertaining to the maintenance of maximum prices imposes a task of some magnitude upon these two defendants. Regulations of this character, together with the many records which the wholesalers and retailers must maintain and reports which must be made out to various governmental agencies, impose numerous and serious burdens. However, in considering the present Act, it must be remembered that it is a war measure; it does not pertain to a few isolated industries and businesses. It is national in scope. If its strict observance will achieve the purposes of the measure, no citizen in these times should complain of the additional burdens. Victory on the home front is not a mere empty and meaningless slogan; it calls to our attention one of the vital battlefronts of the war. Certainly, the success of this Act is dependent upon the patriotic cooperation of all persons to whom it is applicable. Apathy and indifference not only increase the burden of the enforcement agencies, but endanger the ultimate success of the whole program which has been devised to defeat inflation. It would seem that a strict compliance with the terms of the Act and a strict construction of any and all violative acts are essential to the achievement of its purposes and objects, and in determining the necessity of an injunction herein the Court should not consider this controversy as an isolated controversy which exists merely between an agency of the Government and these defendants. Any easy attitude of the courts which even remotely suggests that the Act may be violated with impunity strikes at the entire enforcement problem which in and of itself must be tremendous. If inflation is to be bridled, the control of commodity prices must be effective nation-wide. It should not be permitted to get out of hand in any area of the Nation.

■ .This Court has no jurisdiction to pass upon the reasonableness, effectiveness, or even the validity of the provisions of the regulations herein considered. A special court has been created for that purpose. Section 204, Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix § 924. It may be observed, however, that this legislation derives its existence from the exigencies of war, and that the war power is a broad and comprehensive grant. It is well-nigh limitless. United States v. MacIntosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302. "It must be in order to insure the preservation of the nation and the perpetuity of our liberties." Henderson v. Kimmel, D.C. Kan. October 23, 1942, 47 F.Supp. 635, 641.

Complaints were made to the principal defendants herein as early as May, 1942, that at one store, at least, maintained by the Stores Company, the prices were in excess of the March maximum. Investigators of the plaintiff, with the knowledge, and it should be stated, with the full cooperation and assistance of the defendants, commenced their duties on or about September 2, 1942. There is no showing that such forewarning caused the rectification of any of the admitted or evident violations, nor is there any indication that the principal defendants took any timely steps to "place their own house in order."

V. The regulations promulgated on April 28, 1942, contain in Appendix B a list of so-called "cost-of-living commodities." Section 13(a) of the Regulation requires that, on and after May 18, 1942, every person offering to sell a cost-of-living commodity at retail shall mark the maximum price of such commodity in a manner plainly visible to, and understandable by, the purchasing public. The maximum price may be marked on the commodity itself or on the shelf, bin, rack or other holder or container upon or in which the commodity is kept, or it may be posted at the place in the business establishment where the commodity is offered for sale. Section 13(b) requires that a list showing the maximum prices charged for each of

the cost-of-living commodities shall be filed with the appropriate War Price and Rationing Board of the Office of Price Administration. Such statement must be kept up to date monthly by filing with that office any additional cost-of-living commodities which may be added to the original list and to indicate the maximum prices of such additional items, together with an appropriate description or identification of such newly handled commodity or commodities. In that each store must be considered as a separate unit, it follows that the list of maximum prices for cost-of-living commodities must be filed by each store with the appropriate War Price and Rationing Board. In addition, each store must post such list in a manner which is not only plainly visible, but displayed and arranged so that it is readily understandable by the purchasing public. Obviously, no hard and fast rule can be enunciated as to the method of posting. Each store has its own individual problems depending upon the arrangement and display of its merchandise and other circumstances. However, it appears from this showing that, in some of the stores, the lists were inadequate, the description of the items was insufficient, and in some instances the maximum prices were not even noted thereon. Some cost-of-living items handled at a particular store were omitted entirely. At one store, there was no posting whatsoever. At another, it was not posted, but the list was found under a pile of miscellaneous office records. In many of the stores, the maximum price list of cost-of-living commodities was typewritten on several sheets and hung above a shelf in the store, and under these circumstances the customer would be required to thumb through a number of pages in order to locate the listing of any particular commodity. Then, in a few instances, the prices of the items themselves indicated a higher selling price than the prices to be found for the same commodities on the posted cost-of-living statement. Each of the individual stores failed to file its list with the appropriate War Price and Rationing Board.

It is manifestly a futile gesture to post maximum prices for cost-of-living commodities unless such posting renders the list visible and intelligible to the public. While considerable flexibility must be allowed in permitting the retailer to follow the method best adapted to his particular store arrangement, it is apparent that, in many instances, the retail stores herein have not attempted to follow the plain and obvious purpose of the regulations. It is fair to assume that the purpose in requiring the posting of maximum prices for cost-of-living commodities is twofold— one to acquaint the customer with the ceiling prices and to assure him that he is not being charged more than the maximum prices charged in March, 1942, and the other, the display of a ceiling price statement which is plainly visible and understandable by the public will have a salutary effect on the retailer and tend to lessen discrepancies between the maximum prices which the retailer is permitted to charge and the actual offering prices.

The Office of Price Administration, in the bulletin of May, 1942, on pages 22 and 23 of the reprint, states its interpretation of this regulation. On page 23 will be found the following:

"Whatever marking method is used, ceiling prices must be displayed on or near the merchandise, easily visible to customers. The maximum price must be identified as 'Ceiling Price' or 'Our Ceiling,' and it must be plain to the customer what merchandise the price refers to."

" * * * The guiding rule is: consumers should be able to see the 'ceiling price' marker clearly when standing at the point of purchase without having to ask or look for it, and without having to thumb through pages."

This interpretation seems fair, reasonable, and entirely consonant with the purposes of the Act. An earnest desire by the retailer to cooperate in this regard will dispel most of the apparent difficulties which may seem to loom up when the problem of posting is first considered. Attention may be called to the fact that the Regulation of April 28, 1942, requires that certain base-period records, as required by Section 11 thereof, must be kept and maintained, and that certain current records, as required by Section 12, must likewise be kept and maintained. No attempt on the part of any of these defendants has been made to comply with these sections, and these records have not been prepared, preserved, or made available as the regulations require.

■■ In that each store must be considered as a separate selling unit, and as such amenable to the provisions of the Act, it follows that the direct control and

management rests upon the managers. They are individually obligated, therefore, under the General Maximum Price Regulation to comply with all of its provisions. No attempt has been made by any of the managers to traverse the allegations of the bill of complaint, and while the showing in support of the application for preliminary injunction does not cover the individual situation that may exist in each and every store, it is fair to find from the entire record, and the absence of any denial thereof, that plaintiff's application for a preliminary injunction should be granted as against all the defendants, substantially in the manner prayed for. The Court does not find on this showing, however, that the violations herein enumerated were contumacious or willful. It may well be that they were entirely occasioned through carelessness, neglect and misunderstanding. Mutual and the Stores Company have stated in open court that they are anxious to comply strictly with the letter of the law. The Court has no reason to doubt their good faith or sincerity, but, notwithstanding, the situation requires that the injunction should issue.

Findings of fact and conclusions of law and order granting preliminary injunction may be submitted by counsel for the plaintiff on five days' notice.