BROWN, Adm'r of Office of Price Administration, v. HECHT CO.

No. 8498.

United States Court of Appeals for the District of Columbia.

Argued June 15, 1943.

Decided July 22, 1943.

Writ of Certiorari Granted Oct. 18, 1943.

See 64 S.Ct. 81, 88 L.Ed. ——.

Mr. Fleming James, Jr., Chief, Litigation Branch, O. P. A., of Washington, D. C., with whom Messrs. George J. Burke, General Counsel, Thomas I. Emerson, Associate General Counsel, David London, Head Appellate Section, George M. Austin, Head Special Litigation Section, and A. M. Dreyer, all of the Office of Price Administration, all of Washington, D. C., were on the brief, for appellant.

Mr. Charles A. Horsky, of Washington, D. C., with whom Mr. Spencer Gordon and Miss Amy Ruth Mahin, both of Washington, D. C., were on the brief, for appellee.

Before GRONER, Chief Justice, EDGERTON, Associate Justice, and EICHER, Chief Justice of the District Court of the United States for the District of Columbia.

EDGERTON, Associate Justice.

This is a suit for an injunction, brought by the Price Administrator against the Hecht Company under Section 205(a) of the Emergency Price Control Act of 1942.[1] After issuing a temporary restraining order and holding a full hearing, the District Court dissolved the restraining order and dismissed the complaint.[2]

Section 205(a) provides: "Whenever in the judgment of the Administrator any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act, he *may* make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order *shall* be granted without bond." [Italics supplied.] The pertinent language of section 4, 50 U.S.C.A.Appendix, § 904, is: "(a) It shall be unlawful * * * for any person to sell or deliver any commodity * * * or otherwise to do or omit to do any act, in violation of any regulation or order under section 2, or of any price schedule effective in accordance with the provisions of section 206, or of any regulation, order, or requirement under section 202(b) or section 205(f), or to offer, solicit, attempt, or agree to do any of the foregoing."

The complaint charges the Company with several sorts of violations of the General Maximum Price Regulation which was issued under the authority of the Act on April 28, 1942.[3] These include failures to determine maximum prices in accordance with the Regulation; failures to keep, post or furnish required records, notices, statements, and reports; and selling goods, and offering goods for sale, at more than ceiling prices. The complaint asks an injunction to restrain the defendant, its officers, agents, etc. from similar acts. The Company's answer denies all violations. Without admitting any failure or neglect to comply with any regulation, it alleges that if there has been such failure or neglect it has been involuntary, corrected as soon as discovered, inconsequential, and unsubstantial. It alleges that the Company has made and is making, at great expense, every possible effort to comply; that it would be impossible for it to comply more fully; and that an injunction would injure the Company's reputation and benefit no one.

In its findings of fact or in an accompanying opinion the District Court said among other things: "The defendant and its employees have attempted, in good faith, to comply with the act, and have taken vigorous steps to do so. The compliance thus resulting has been very substantial. * * * Violations occurred but I do not consider them numerous in view of the difficulties involved in defendant's efforts to comply with the act and regulation. * * * The defendant took timely, positive and vigorous measures to understand the requirements and to meet them. It set up a capable organization with an unlimited expense account, charged with the duty of directing and supervising the personnel in an honest and sincere effort to comply in full measure with the requirements of the act and regulation. * * * I do not find that the defendant company is chargeable with bad faith or * * * disloyal motive or purpose. It is not charged that the defendant was wilful in its violations and I think it appropriate to say that the element of wilfulness is entirely lacking in the evidence. * * * Some of the violations may have resulted from negligence or carelessness but I find them innocent in character. No inference of intentional wrong doing may be drawn from them. It may be said to the credit of the defendant company that all errors and mistakes were promptly corrected as soon as they were discovered. It should also be added that the defendant has consistently improved its methods and its records to more fully meet the requirements of the act and regulation and to combat the difficulties which arise from the elements of human frailty. * * * These mistakes in pricing and listing were all made in good faith and without intent to violate the regulations. The performance of the store as to posting was excellent. * * * There is manifestation of

---

[1] Act of Jan. 30, 1942, 56 Stat. 23, 33, 50 U.S.C.A.Appendix, § 925(a).

[2] Brown, Administrator, v. Hecht Company, D.C., 49 F.Supp. 528.

[3] 7 Fed.Reg. 3153.

good faith by the defendant, and I find no likelihood of further violation by it." But the court's conclusions of law show, and the Company concedes, that this last statement means only that "there will be no further violations except such as may be caused by human frailties." The Company concedes that there will be further violations, and contends that it cannot avoid them.[4]

The court also found that "an injunction would have no effect by way of insuring better compliance in the future and would be unjust to the defendant. An injunction would not be in the public interest." These findings regarding the effect of an injunction are immaterial, in the view we take of the law, and we need not consider whether the evidence supports them. The court's other findings are supported by substantial evidence and we therefore accept them as correct. We do not understand either party to question any of these other findings which we understand the court to make. The Administrator concedes that the Company's violations were not wilful. It is clear that the Company made serious and costly efforts to comply with the law.

But it is also clear that in many hundreds of instances the Company failed to comply with the law. This suit was based upon a "spot check" which the Administrator made in a few departments of the Company's store. The Company does not question the correctness of the Administrator's statement that "the evidence showed without dispute that in a space of only five months in but seven of the 100 or more departments defendant in direct violation of the * * * Regulation, (1) made 3,838 sales at prices in excess of the legal maximum; (2) collected at least $4,623.15 more than it was legally entitled to do; (3) failed to include on the Cost-of-Living Statement which it was required to file with the appropriate War Price and Ration Board more than 460 articles which should have been included thereon; and (4) failed to describe with sufficient clarity more than 410 items scheduled on the Cost-of-Living Statement which it did file. * * * Wherever investigation was made violations were found."

Within the meaning of § 205(a) the Company "has engaged * * * in * * * acts or practices which constitute * * * a violation of * * * section 4." Many statutes are interpreted to mean that one who actually does what the statutes prohibit is guilty of violating them notwithstanding his good faith. "Many instances of this are to be found in regulatory measures in the exercise of what is called the police power where the emphasis of the statute is evidently upon achievement of some social betterment rather than * * * punishment * * * *".[5] Statutes may be interpreted in this way despite the fact that they impose criminal penalties. In the case just quoted the Supreme Court interpreted in this way a statute which made it a crime to sell narcotics, as applied to a defendant who was not shown to have known that he was selling narcotics.

Our case is a clearer one for the application of the principle that good faith is no defense, since § 205(a) imposes no criminal penalties. Its purpose is not in any degree to punish the defendant, but solely to protect the public. It is a police regulation of great scope and importance. Innocent non-conformity with the Price Control Act is as inflationary and as damaging to competitors and the public as guilty non-conformity. The intention of Congress in § 205(a) to cover well-intentioned as well as ill-intentioned conduct is emphasized by the contrast between the language which Congress used in this subsection and in the one which immediately follows it. § 205(b), which imposes criminal penalties, deals with "any person who willfully violates any provision of section 4," while § 205(a), which provides for injunctions, deals with "any acts or practices which constitute or will constitute a violation of any provision of section 4."

---

4 We do not understand the court's findings to mean that the Company's violations of the Act were "unsubstantial" or that no future violations were likely to occur. The evidence would not support such findings. The Company says in its brief, "The Price Administrator contends that the Court erred in holding that 'the defendant would probably not continue to violate the Act and Regulations.' That was substantially what the Court said in its memorandum opinion, but in its formal conclusions the Court properly qualified the statement, for it is obvious that there will always be some mistakes no matter how hard the employees of the store try to comply with the provisions of the regulations."

5 United States v. Balint, 258 U.S. 250, 252, 42 S.Ct. 301, 302, 66 L.Ed. 604.

██ Despite the Company's past and present good intentions, by the express terms of the statute the Company's past violations authorized the District Court to enjoin future violations.[6] In order to justify the granting of an injunction under an express and unrestricted statutory authority, no balancing of equities is necessary and neither threatened irreparable injury nor lack of an adequate remedy at law need be shown. General equitable doctrines "do not militate against the capacity of a court of equity as a proper forum in which to make a declared policy of Congress effective." [7]

The question remains whether the Act merely *authorized* the court to grant an order without regard to equitable considerations, such as the Company's good intentions and the probable effect of granting an order, or whether it *required* the court to do so. Unless it required the court to do so, Congress turned over to the court the important question whether the granting of an order against a violator of the Act should be a matter of course or should depend upon the general principles of equity. But Congress was free to decide that question and there was no apparent reason for leaving it to the court. We think Congress did not leave it to the court. The phrase "a permanent or temporary injunction, restraining order, or other order shall be granted", in its context, means in our opinion that an injunction or other order is to be granted as of course when violations of the Act are found. Only the affirmative or negative character of the order, and its other details, are left to the court's discretion.

██ To most laymen, the question whether the word "shall" in a statute is mandatory would doubtless seem to answer itself. The legal proposition that the word is not necessarily mandatory and may be "merely directory" is a more or less technical one. Sometimes this proposition means only that violation of a statutory mandate may entail no consequences when the statute prescribes none; as when waivers of notice are allowed to validate a corporate meeting held without notice although a statute provides that notice shall be given.[8] Sometimes it means only that the author of a mandate may be privileged to change or break it. Thus it has been held that a court[9] or an administrative body[10] may waive some of its own rules despite the presence in the rules of the word "shall", and that a legislature may change the means by which it has itself provided that process "shall" be served upon a corporation.[11] In some of the State court cases on which the dissenting opinion relies, the proposition is a euphemism which covers judicial refusal to follow a legislative mandate addressed to the court. In some contexts, perhaps, it has been found by way of genuine statutory construction that a particular "shall" was more or less equivalent to "may." It is nonetheless true that the word "shall" in a statute is normally "the language of command." [12] We think the word has its normal meaning in § 205 (a).

Since no two statutory uses of the word are identical in context, purpose, and legislative history, argument from one statute to another is not conclusive. But there is enough resemblance between the direction of Congress to the Board in the National Labor Relations Act[12a] and its direction to the Court in the Price Control Act to make pertinent the Supreme Court's view that the Board must issue a cease and desist order when it finds that an employer has engaged in unfair labor prac-

---

[6] Federal Trade Commission v. Goodyear Tire & Rubber Co., 304 U.S. 257, 58 S.Ct. 863, 82 L.Ed. 1326; Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 230, 59 S.Ct. 206, 83 L.Ed. 126; Fox Film Corp. v. Federal Trade Commission, 2 Cir., 296 F. 353; Federal Trade Commission v. Wallace, 8 Cir., 75 F.2d 733; Educators Ass'n v. Federal Trade Commission, 2 Cir., 108 F.2d 470, 473; Gimbel Bros. v. Federal Trade Commission, 2 Cir., 116 F.2d 578; National Labor Relations Board v. Burke Machine Tool Co., 6 Cir., 133 F.2d 618.

[7] United States v. San Francisco, 310 U.S. 16, 31, 60 S.Ct. 749, 757, 84 L.Ed. 1050;

United States v. Adler's Creamery, Inc., 2 Cir., 110 F.2d 482.

[8] Butler Paper Co. v. Cleveland, 220 Ill. 128, 77 N.E. 99, 110 Am.St.Rep. 230.

[9] West Wisconsin R. Co. v. Foley, 94 U. S. 100, 24 L.Ed. 71.

[10] United States v. Coe, 67 App.D.C. 207, 91 F.2d 238.

[11] Railroad Co. v. Hecht, 95 U.S. 168, 24 L.Ed. 423.

[12] Cardozo, J., in Escoe v. Zerbst, 295 U.S. 49, 493, 55 S.Ct. 818, 79 L.Ed. 1566. Ex parte Jordan, 94 U.S. 248, 251, 24 L. Ed. 123.

[12a] 29 U.S.C.A. § 151 et seq.

tices.[13]   The Jordan case[13a], like the present case, involved a direction addressed by Congress to the courts. The *Supreme Court said*: "The allowance of an appeal under sect. 692, Rev.Stat., follows of course, if prayed for by one who has the right to it. The language of the statute is, *'shall* be allowed,' which means *'must* be allowed,' when asked for by one who stands in such relation to the cause that he can demand it." The cases on which the Company chiefly relies were decided under statutes which neither provide that an order "shall be granted" by the court nor direct any comparable language to the court. These cases, in our opinion, are not in point. The language of the Sherman Anti-Trust Act is that "The several district courts of the United States are invested with jurisdiction to prevent and restrain violations * * *."[14]   The Federal Trade Commission Act provides that when a court is asked to review an order of the Commission it "shall have jurisdiction of the proceeding and of the question determined therein, and shall have power to make and enter upon the pleadings, evidence, and proceedings set forth in such transcript a decree affirming, modifying, or setting aside the order of the Commission, and enforcing the same to the extent that such order is affirmed * * *."[15]   In proceedings to review an order of the National Labor Relations Board the courts have "power * * * to make and enter * * * a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board."[16]   By the Agricultural Adjustment Act the district courts were "vested with jurisdiction specifically to enforce, and to prevent and restrain any person from violating, * * * any order * * * made or issued pursuant to this title * * *."[17]   The Fair Labor Standards Act of 1938 provides that district courts "shall have jurisdiction, for cause shown * * * to restrain violations * * *."[18] Congress chose to use very different language in the Emergency Price Control Act. The Securities Act of 1933 and the Securities Exchange Act of 1934 provide that the court "shall" issue an order, but only "upon a proper showing";[19] a limitation which suggests incorporation of the general principles of equity.

Neither the context nor the legislative history of the Emergency Price Control Act suggests any unusual meaning of the word "shall." On the contrary, both confirm its common meaning. It is recognized that the use of "may" and "shall" in one sentence implies that each word is used in its own ordinary sense and not in the ordinary sense of the other.[20]  A single

---

[13] " * * * § 10(c) directs that when the Board finds that any person has engaged in unfair labor practices it 'shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action * * * as will effectuate the policies of this Act. * * *' Notwithstanding the mandatory form of § 10(c), its provisions in substance leave to the Board some scope for the exercise of *judgment and discretion* in determining, upon the basis of the findings, whether the case is one requiring an *affirmative order.* * * *" [Italics supplied.] National Labor Relations Board v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 265, 58 S.Ct. 571, 573, 82 L.Ed. 831, 115 A.L.R. 307. This implies that the provisions of section 10(c) leave to the Board no scope for the exercise of judgment and discretion in determining, upon the basis of the findings, whether the case is one requiring a *negative* ("cease and desist") order.

[13a] Supra, note 12.

[14] 26 Stat. 209 § 4, 15 U.S.C.A. § 4.

[15] 15 U.S.C.A. § 45(c), 38 Stat. 720, as amended.
   The Federal Trade Commission Act provides also that when the *Commission* finds a prohibited act or practice the *Commission* "shall issue * * * an order * * * to cease and desist from * * * such act or practice." 15 U.S.C.A. § 45(b). Some Circuit Courts of Appeals have thought that the Commission not only need not, but may not, issue an order to "cease and desist" from practices which have been abandoned and are not likely to be repeated. John C. Winston Co. v. Federal Trade Commission, 3 Cir., 1925, 3 F.2d 961; Federal Trade Commission v. Civil Service Training Bureau, 6 Cir., 79 F.2d 113. But cf. note 6, supra. The words "cease and desist," which may seem to imply present continuance or probable repetition, are not present in § 205(a) of the Price Control Act; and the company concedes that its violations of the Act have not ceased.

[16] 49 Stat. 454, 29 U.S.C.A. § 160(e).

[17] 48 Stat. 675, 7 U.S.C.A. § 608a(6).

[18] 52 Stat. 1069, 29 U.S.C.A. § 217.

[19] 48 Stat. 86, 15 U.S.C.A. § 77t(b); 48 Stat. 899, 15 U.S.C.A. § 78u(e).

[20] Murray v. Edes Mfg. Co., 305 Mass. 311, 25 N.E.2d 746; State ex Inf. McKittrick v. Wymore, 343 Mo. 98, 119 S.W.2d 941; Smith v. School Dist., 241 Mich.

sentence in § 205(a) provides that the Administrator "may" apply for an order and that an order "shall" be granted. If Congress had been using "shall" in the sense of "may" there would have been no reason for using "may" instead of "shall" in regard to the Administrator.

When H. R. 5479, for which the present Act was substituted, was in the House of Representatives, Section 205(a) read: " * * * upon a proper showing a permanent or temporary injunction, restraining order, or other order shall be granted without bond." Accordingly the House Committee on Banking and Currency said in its report: "Upon a proper showing a temporary or permanent injunction, restraining order, or other order is to be granted without bond." [21] But the Senate Committee struck out the words "upon a proper showing" and substituted the words "upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices." The Committee's report said: "Upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices, a temporary or permanent injunction, restraining order or other order is to be granted without bond." [22] The words "upon a proper showing," qualifying "shall be granted" in the Securities Exchange Act, had been thought to give a court discretion to deny an injunction when it would not be "consistent with the general principles of equity" to grant one.[23] We infer that it was precisely for the purpose of avoiding that result that the Senate Committee changed the language of § 205(a). The Senate Committee made its report on January 2, 1942. It pointed out that the House of Representatives had acted before Pearl Harbor; that "what was before a moderate program of rearmament and friendly aid is now unlimited national mobilization in a war for survival"; that the House bill "must be reconsidered in the light of these changed conditions"; that "in amending the House bill, the committee has sought to strengthen it"; and that "the committee has largely accepted the substantive provisions of the House bill, but regards prompt enactment of this stronger bill as imperative to the safety of our country."

When Congress passed ·the Emergency Price Control Act it realized that there was an emergency. It knew that the war was producing and would produce prodigious increases in public expenditures and private purchasing power together with a dearth of many things for which buyers compete. It knew that unless effective price control was achieved, these conditions would force up prices and then wages to meet prices and then prices to meet wages, until and even after inflation became fantastic. It realized that, as the Senate Committee said, "of all the consequences of war, except human slaughter, inflation is the most destructive. * * * Rising prices and increases in the cost of living bring misery to our people, cause industrial unrest, and undermine our unity. * * * Living costs tend to rise more quickly than wages, [and] the burdens of war are haphazardly distributed, with the heaviest burden on the farmer, the salaried worker, the small investor, the pensioner, and the veteran, whose incomes cannot readily be expanded. Rising living costs mean labor disputes and spiraling wage demands. And the suspicion of profiteering causes discontent which hampers production as surely as the bombing of factories. Rising prices now foreshadow * * * deflation later with attendant depression and suffering. Such prospects and fears * * * sap energy and morale now. Rising prices limit production. For price uncertainties prevent future planning and long-term commitments which are an integral part of the industrial process. * * * Rising prices inevitably increase the cost of the defense program." [24]

Inflation is infectious and cumulative. It

---

366, 217 N.W. 15; State ex rel. Wendling Bros. Co. v. Board of Education, 127 Ohio St. 336, 188 N.E. 566.

[21] H.R.Rep. No. 1409, 77th Cong., 1st Sess. (1941), p. 12.

[22] Sen.Rep. No. 931, 77th Cong., 2d Sess. (1942), p. 25. To say, as the Senate Committee's report does, that "courts are given jurisdiction to issue whatever order to enforce compliance is proper in the circumstances of each particular case" (Ibid., p. 10) is not, as the Company suggests, to imply that courts are authorized to refuse to issue any order to enforce compliance. The words "whatever order," like the words "other order" in Section 205 (a) itself, evidently refer to the fact that the section permits the court to choose between an injunction against violation of the act and an affirmative order requiring compliance.

[23] Securities and Exchange Commission v. Lawson, D.C.Md., 24 F.Supp. 360, 365.

[24] Sen.Rep. No. 931, 77th Cong., 2d Sess. (1942), pp. 2, 3.

cannot be prevented in general unless it is prevented in particular. The Emergency Price Control Act is designed to prevent inflation. To that end it provides various means. These include price fixing, subsidy payments, licensing, criminal penalties, damage suits, and the remedy which the Administrator seeks here. There is nothing new or strange in the belief of Congress that an injunction or other order, with the possibility of contempt proceedings, is an effective means of law enforcement. The legislative history of the entire Act, like that of § 205(a), tends to show that Congress meant what it said and why it meant what it said when it provided that an order shall be granted upon a showing that the Act has been violated. The limitation upon the court's discretion is unusual, but the situation which evoked it is extraordinary. The emergency is more acute today than when the Act was passed. "Any easy attitude of the courts which even remotely suggests that the Act may be violated with impunity strikes at the entire enforcement problem * * *." [25]

Reversed.

EICHER, Chief Justice of District Court.

■ I concur fully in Judge EDGERTON'S opinion, but upon reading Chief Justice GRONER'S dissenting opinion I deem it appropriate to add several supplemental observations. It is difficult for me to view an injunction which merely forbids violation of the law as a punishment. Further violations are not only threatened in this case, but are claimed to be unavoidable. If, after injunction, they do occur, and contempt proceedings follow, then for the first time do quasi-criminal sanctions come into play and penalties may be imposed. Before doing so, courts can and will give full weight to a showing that violations have been inadvertent and innocent and not wilful, for in such an inquiry the courts are no longer under statutory mandate, but are exercising their inherent powers.

■ This leads me to observe that the Emergency Price Control Act is sui generis in one important respect. It has set up an Emergency Court of Appeals upon which Congress has conferred exclusive jurisdiction to try all questions affecting the validity of the Act and of regulations promulgated thereunder. If specific regulations cannot be complied with, the place to test them is not in this proceeding but in the forum that Congress has provided, or in Congress itself which gave those regulations the force and effect of law.

Also I would respectfully comment upon the dissenting opinion's quotation from the Report of the Senate Committee by pointing out that it refers to "orders to *enforce compliance.*" In a case where non-compliance is conceded, how can any discretion be gleaned from those words?

And, further, it occurs to me that the same thought pervades the words "or other order" in the statute, which are followed by the words "*shall* be granted *without bond.*" It is true they imply discretion to grant some other order than an injunction, but I cannot believe they imply discretion to grant no order at all, the statutory showing of violation being present. To the contrary, the words "without bond" inexorably imply an order that otherwise would require bond, namely, an order for some sort of affirmative relief.

Finally, I believe that failure to cooperate with the Administrator where the statutory facts appear, would encourage resumption of violations and would amount to judicial modification of clearly announced Congressional policy.

Judge EDGERTON concurs in this opinion.

GRONER, C. J. (dissenting).

I think it not improper to state briefly the reason I am unable to concur in the Court's opinion. The record shows that after extensive hearings the District Court made findings to the effect that though violations of the Price Control Act had been shown, they were, in the circumstances, neither numerous nor wilful and that defendant at all times after the passage of the Act attempted in good faith to comply with its provisions and took vigorous steps to do so, and that in those instances in which errors of overcharge were made the mistakes were corrected as soon as discovered. I mention these findings merely as background. I am far from thinking that, alone, they are enough. The significant thing to me is that the Court also made findings that prompt and proper steps had been taken by defendant to improve its control system so

---

[25] Henderson v. C. Thomas Stores, Inc., D.C., D.Minn., 48 F.Supp. 295, 301. Unreported District Court decisions on the questions before us are in conflict.

as to insure as nearly as possible future compliance with the provisions of the Act, and as a result of which there was no likelihood of avoidable violations and no reason to apprehend them.[1] Based on these findings and conclusions, the Court held that it was not in the public interest to issue an injunction and that to do so would be unjust to the defendant and "would have no effect by way of insuring better compliance in the future." As the findings are abundantly supported by the evidence, it seems to me the conclusion that nothing would be accomplished by an injunction, and that therefore there was no necessity for it, was well within the District Court's judicial discretion and in accordance with established equitable procedure. The Administrator, however, insists that established equitable principles have no place in a case brought under the Price Control Act, because, as he says, Congress in using the word "shall" obviously intended to coerce judicial action. This brings me then to the single question for decision—Does the Act, properly construed, command the granting of the injunction? Section 205(a) provides: "Whenever in the judgment of the Administrator any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act, he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond."

As the opinion very well points out, the use by Congress of the word "may" in the forepart of the section, authorizing the Administrator to apply for an injunction, followed by the word "shall" in providing the action to be taken by the court, may, if taken literally, be said to indicate a compulsory purpose and as excluding the idea of discretion in the court to decide whether in a particular case the relief asked is necessary or proper, and that is what the opinion holds. Then, too, this view may be said to be strengthened when it is considered that the bill as it passed the House contained the provision authorizing an injunction "upon a proper showing," whereas these words were later stricken in conference and omitted in the bill as finally passed. But, notwithstanding all of this, I am by no means convinced either that the word "shall" of itself, or that the conference change to which I have referred, should be given the significance of exclusion of the idea of judicial discretion. I think it is more reasonable and proper and more consonant with authority to consider both as subject to the necessary limitation that an equitable case has been made for the exercise of the power. More than appears, I think, is necessary to justify the assumption that Congress intended to coerce judicial action and to destroy judicial discretion and hence to require an injunction to issue, even where the court finds, as it did here, that the facts are such that to do so would accomplish no other result than is already accomplished by the voluntary action of the defendant.

In saying this I am not unmindful that the statutory use of "shall" ordinarily carries a mandatory connotation. But while this is true, it is also true that one of the outstanding and recognized exceptions is that in cases where the legislative direction is addressed to a court or to a judge with relation to a proceeding in its nature equitable, peremptory phrasing which would operate to preclude the exercise of traditional judicial discretion is not and ought not to be given a literal interpretation, unless

---

[1] The opinion makes much of the fact that the trial court in stating that there was no likelihood of further violations of the statute, granted that the element of "human frailty", to which all flesh is heir, might possibly make for occasional future mistakes in the practical application of the complicated and often contradictory price regulations. This so-called concession the court obviously made as the result of its own finding that even the Administrator's experts in their examination of the defendant's methods had themselves made numerous mistakes. With this in mind the court very properly qualified its absolute finding that there would be no future violations by defendant, by adding, except such as resulted from human frailty. And this in turn was no more than the recognition by the court of the verity of Pope's Criticism that—

"Whoever thinks a faultless piece to see,
Thinks what ne'er was, nor is, nor e'er shall be."

It is therefore altogether inadmissible to argue the legal question which is the heart of this case from any other premise than the one stated in this dissent, namely, the finding of the court of a manifestation of good faith by the defendant and no likelihood of further violation by it.

it is clearly certain that the legislature so intended. Becker v. Lebanon & M. Ry. Co., 188 Pa. 484, 41 A. 612; In re Rutledge, 162 N.Y. 31, 56 N.E. 511, 47 L.R.A. 721; Clancy v. McElroy, 30 Wash. 567, 70 P. 1095; Sutherland, Statutory Construction (3d Ed.), Sec. 5810; Crawford, Statutory Construction, Sec. 267. Even where the legislature has used the unambiguous "must", courts have reached the same conclusion. State v. District Court, 106 Mont. 272, 76 P.2d 634.

Some cases create a superficial, contrary impression. These are distinguishable, however, as cases in which the terms of the applicable statute are not addressed to the court, or the type of proceeding is not in its nature equitable. See for example Mack v. State, 203 Ind. 355, 180 N.E. 279, 83 A.L.R. 1349, which involved the mandatory death penalty statute; Lynn v. Lynn, 256 Pa. 563, 100 A. 975, involving an action of replevin; State v. Mavrikas, 148 Wash. 651, 269 P. 805, statutory confiscation of equipment used in illegal fishing. But with exceptions of this character the rule stated above is generally applied; and this rule obtains even as to statutes in which in addition to the direction that the court "shall", the word "may" is also elsewhere used. State v. Braun, 62 Idaho 258, 110 P. 2d 835.

Nor do I find anything in the Act, taken as a whole, which indicates a purpose to make the injunction provision mandatory in every case. Specific punishments are otherwise provided for in other sections for wilful violations of the Act. And it is not going too far to assume that these cover the punishment field. To adopt the majority view would add, as the District Court found, an additional punishment for an inadvertent and innocent violation. And this, contrary to the well established rule that the writ of injunction is used only to stop existing or threatened violations and not to punish past offences. Swift & Co. v. United States, 276 U.S. 311, 326, 48 S.Ct. 311, 72 L.Ed. 587; Walling v. Shenandoah-Dives M. Co., 10 Cir., 134 F.2d 395. Considered in this view, I think the language of the section should be taken only as a grant of authority to act in accordance with well established and well understood equitable procedure; and my view, to some extent at

least, is fortified by the Report of the Senate Committee on the section in question, where it is said: "Such courts are given jurisdiction to issue whatever order to enforce compliance is proper in the circumstances of each particular case." And this view of the Committee is grounded on the language used in Section 205, where it is said that upon a showing by the Administrator that the person proceeded against has engaged in the unlawful practice denounced, the court shall grant a permanent or temporary injunction, restraining order, "or other order,"—additional words, which to me imply discretion rather than coercion, and which otherwise are useless and redundant.

And I find neither in the opinion nor in the Administrator's brief any authority convincingly to the contrary. The Supreme Court case of National Labor Relations Board v. Pennsylvania Greyhound Line, 303 U.S. 261, 265, 58 S.Ct. 571, 574, 82 L.Ed. 831, 115 A.L.R. 307, relied upon in the opinion, I think more persuasive of the view I have stated than the view for which it is cited. There the language of Chief Justice Stone that "notwithstanding the mandatory form of section 10(c), its provisions in substance leave to the Board some scope for the exercise of judgment and discretion in determining, upon the basis of the findings, whether the case is one requiring an affirmative order, and in choosing the particular affirmative relief to be ordered", indicates to me that there may properly be found in the present Act, as applied to the facts of this case, compelling reasons for "some scope" in the exercise of judicial discretion.[2]

Without more, therefore, I am of opinion that the District Court had authority, upon the finding that the practices complained of were innocently done and would not be repeated, to exercise discretion to refuse injunctive relief. But I am also of opinion that the District Court should not have dismissed the complaint, but should have entered an order retaining it on the docket, with the right to the Administrator, on reasonable notice and a showing that violations of the Act had been resumed, to again apply to the court for injunctive relief.

---

[2] Because of the conjunctive union of the terms "cease and desist" and "affirmative relief" in the Labor Board Act, it would seem a more reasonable inference that whatever the Supreme Court stated concerning the one would apply with equal force to the other.