BOWLES, Administrator, Office of Price Administration, v. WARNER HOLDING CO.

Civ. No. 884.

District Court, D. Minnesota, Fourth Division.

Oct. 26, 1944.

Warner Holding Company, to enforce compliance with the Act and the applicable price regulations. A preliminary injunction has been granted. See Brown v. Warner Holding Co., D.C., 50 F.Supp. 593. Plaintiff also seeks an order compelling restitution to certain tenants of rents collected by defendant in excess of "ceilings". These questions present different considerations and will be discussed separately.

### I. Injunction of Violations of the Act and Regulations.

The pertinent provisions of section 205 (a) of the Act are: "Whenever in the judgment of the Administrator any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of section 4 of this Act [see footnote 1] he may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Administrator that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order shall be granted without bond."

The power of this court under this section has been carefully resolved in Hecht Co. v. Bowles, 321 U.S. 321, 64 S. Ct. 587, 88 L.Ed. 754. The Supreme Court there held that although "the cessation of violations, whether before or after the institution of a suit by the Administrator, is no bar to the issuance of an injunction under § 205(a)", 321 U.S. 327, 64 S.Ct. 591, 88 L.Ed. 754, the statute is not mandatory and the type of order and whether one should issue is within the discretion of the court in the exercise of its historic equity powers. This discretion must be exercised " * * * in light of the large objectives of the Act. For the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief in these cases. That discretion should reflect an acute awareness of the Congressional ad-

Arnold A. Karlins, Chief Atty., Minneapolis-St. Paul Defense Rental Area Office, of Minneapolis, Minn., Alex Elson, Regional Atty., of Chicago, Ill., and Ralph M. McCareins, District Enforcement Atty., Twin Cities District Office, Office of Price Administration, of St. Paul, Minn., for plaintiff.

R. H. Fryberger and M. R. Keith, both of Minneapolis, Minn., for defendant.

JOYCE, District Judge.

This is a suit under the Emergency Price Control Act of 1942, § 205(a), 50 U.S.C.A.Appendix § 925(a), hereinafter called the Act, by the Administrator of the Office of Price Administration, against

---

1 Section 4(a) of the Act, 50 U.S.C.A. Appendix § 904(a) provides: "It shall be unlawful, regardless of any contract, agreement, lease, or other obligation heretofore or hereafter entered into, for any person * * * to demand or receive any rent for any defense-area housing accommodations, or otherwise to do or omit to do any act, in violation of any regulation or order under section 2 * * * or of any regulation, order, or requirement under section 202(b) or section 205(f), or to offer, solicit, attempt, or agree to do any of the foregoing."

monition that 'of all the consequences of war, except human slaughter, inflation is the most destructive' (S.Rep. No. 931, supra, p. 2) and that delay or indifference may be fatal." 321 U.S. 331, 64 S.Ct. 592, 88 L.Ed. 754.

With these principles in mind the facts of the case must determine whether plaintiff should be granted the relief asked. The following grounds are specified in the complaint: (a) demanding or receiving or attempting to demand or receive rents in excess of the maximum as prescribed by the regulations; (b) attempting to evict tenants in violation of the regulations; (c) failure to properly register rental units with the rent control office.

(a) Defendant is a corporation owning eight apartment buildings in the city of Minneapolis that are involved in these proceedings. The buildings contain approximately 280 rental units. The local rent control office made a "spot check" of defendant's books and records and prepared tabulations covering twenty rental units, some in each apartment building. The tabulations disclose collection of rents in excess of the ceiling in 155 instances. The amount of each overcharge varies from $1.50 to $16.50 per month and totals $807.75. It is conceded that these computations are correct.

■ Defendant's principal contention is that "in practically every instance" the apartment was rented under a lease for a definite term with a designated sum as rent for that term, and although this sum was payable monthly in advance, there can be no violation until defendant collects an amount in excess of the total specified in the lease on the base date. (The "base" or "maximum rent" date was March 1, 1942, for accommodations rented on that date, with other provisions for accommodations subsequently rented). Therefore, defendant contends that this action is premature. Defendant argues that as it had the established practice on the maximum rent date of renting on a contractual basis for a fixed term and amount, "maximum rent" as used in the regulations must be defined as the term total prescribed in the lease and not the monthly instalment actually paid by the tenant. I cannot agree with this contention. There is no evidence in this case that any tenant paid his "rent" more than one month in advance. Although a tenant might have the right to pay for a full year in advance under his lease, I do not see what effect

that would have on the rent ceiling unless on the maximum rent date some tenant had actually done so. The leases provided for monthly payments in specific amounts. These amounts were paid by the tenants and accepted by the landlord on a monthly basis and are controlling in determining the maximum rents. Although defendant marked its receipts "on account" of rent, it is apparent that monthly payments were considered as the "rent". The following rider is attached to one of the leases and will suffice: "It Is Understood And Agreed that retroactive to November 1, 1942 to the expiration of the office of Price Administration rent control act, your *rent* is hereby reduced $2.50 *per month.*" (Italics supplied).

Section 2(h) of the Act as amended June 30, 1944, 50 U.S.C.A.Appendix § 902(h), now reads: "(h) The powers granted in this section shall not be used or made to operate to compel changes in the business practices, cost practices or methods, or means or aids to distribution, established in any industry, or changes in established rental practices, except where such action is affirmatively found by the Administrator to be necessary to prevent circumvention or evasion of any regulation, order, price schedule, or requirement under this Act."

■ Defendant contends that under the above-quoted provision, before it can be found in violation, there must be an affirmative finding by the Administrator that the monthly instalments under the term lease are the ceilings. This argument is predicated on the assumption that defendant is compelled to change its business practice of renting by leases for a fixed term with monthly instalment payments. This is not the case. Nothing in the statute or regulations compels defendant to abandon this practice so long as it does not increase the amount of the term total or the monthly instalments due above the provisions in the lease in effect on the maximum rent date. As there is no compulsion to change rental practices, there is no need for an affirmative finding by the Administrator in this case.

■ Even if defendant's contention were valid it has little factual basis here. On only four apartments was there a lease during both the base and violation periods. The later leases all showed increases both in the term total and the monthly payments. Whatever definition

might be given to "maximum rent" in these cases, the execution of the leases and the collection of the monthly instalments under them were violations of rent control. On ten apartments there were no leases on the maximum rent date although there were during the violation period, all calling for higher monthly payments than the maximum. On at least two apartments there were no leases either on the maximum rent date or during all or part of the violation period. To these situations defendant's argument is not applicable.

Defendant introduced testimony for several days including some 184 exhibits, consisting of correspondence, leases, petitions for adjustments in rent, registration forms, evidence of defendant's rental practices such as charging more for additional occupants including infants, evidence of improvements, redecorating, and of continued jousting with the rent control office. This mass of evidence was marshalled with commendable thoroughness and ably presents defendant's position that in many instances an increase in rental was justified because of increased services and improvements. Whatever views this court might have on these problems, the maximum rent on any particular dwelling unit is determined by the Administrator of the Office of Price Administration and the regulations issued pursuant to the Emergency Price Control Act. Judicial review of these determinations is exclusively vested in the Emergency Court of Appeals and the Supreme Court of the United States by section 204 of the Act, 50 U.S.C.A.Appendix § 924. This court has no jurisdiction to pass upon the validity or effectiveness of regulations or orders promulgated pursuant to this Act. Henderson v. Kimmel, D.C.Kan., 47 F.Supp. 635; Henderson v. C. Thomas Stores, D.C.Minn., 48 F.Supp. 295. The record discloses that in comparatively few instances did defendant avail itself of the procedure prescribed in section 203 of the Act, 50 U.S.C.A.Appendix § 923, for appeal from adverse determinations by the local area rent director, and in no instance did defendant seek judicial review by the Emergency Court of Appeals. In the few cases where an appeal was taken defendant was not entirely without success. Defendant's president explained the failure to protest other adverse determinations by testifying that he felt it would be useless and that he felt "frustrated". In any event the determination by the regulations and the Administrator of the ceilings for the rental units involved must be accepted as final in this court. It is therefore beyond dispute that these violations occurred.

(b) The second count charges defendant with "evicting or attempting to evict tenants" in violation of the regulations. There is no evidence of actual evictions and the attempts consisted of a series of letters written by defendant to various tenants in September and October, 1943, some time after the preliminary injunction was effective. The letters are similar in wording and tone. The following excerpt is illustrative:

"Inasmuch as we require to obtain an apartment for the writer's daughter * * *, and assuming that the Emergency Price Control Act of 1942 is unconstitutional in whole, or in part respecting rents, we formally request the apartment you are now occupying to be vacated November 30, 1943.

\* \* \* \* \* \*

"This is to notify you that if the Emergency Price Control Act of 1942, as respecting rents is finally adjudged unconstitutional, and you elect to stay in our apartment against our wishes, beyond November 30, 1943, that you are obligated to us for eleven months' rent at a cost to you of $1200, plus 40% extra for attorney's fees, if necessary to employ an attorney to collect the same, * * *.

"As and if the Emergency Price Control Act of 1942 is finally adjudged constitutional in its entirety, or as respecting rents, you would be safe in arbitrarily staying in our building, contrary to our wishes and notices in the matter.

"If you elect to remain in the premises in spite of this notice, we require you to furnish us with suitable financial guarantee satisfactory to us on demand.

"However, we have no desire to have you continue to reside in our premises, and much prefer that you vacate the apartment on November 30, 1943, as requested."

Section 205 (a) of the Act, 50 U.S.C.A. Appendix § 925(a), gives the Administrator the right to seek an injunction for any violation of section 4 of the Act. Section 4(a) (see footnote, supra) defines as unlawful any *"attempt * * * to do any of the foregoing."* Section 1388.286 (a) of Maximum Rent Regulation 53 states: "So long as the tenant continues to pay the rent to which the landlord is entitled, no tenant shall be removed from any

housing accommodations, by action to evict or to recover possession, by exclusion from possession *or otherwise,* nor shall any person *attempt* such removal or exclusion from possession, * * *" (italics supplied).

In providing for injunctive relief for attempted violations the Act and regulations are consistent with historic equity practice.

■ The purpose and intent of these letters is self-evident. The tenant is told to move or if the Act is held invalid he will become liable to defendant for a sum varying from $750 to $1200 plus 40% attorney's fees *in addition* to the maximum rent. This is clearly an attempt to force the tenant to move or gamble with the landlord at the latter's terms upon the validity of the law. The uncertain position of the tenant upon the receipt of such a letter and the "pressure" on him to move can easily be imagined. My conclusion is that these letters were attempts at eviction without compliance with the regulations.

The letters are also a violation of the spirit of the injunction issued by this court June 29, 1943. Defendant was therein enjoined "directly or indirectly, from demanding or receiving, or attempting to demand or receive, rent" above the maximum. By conditioning its demand upon the invalidity of the Act defendant is not immune from the consequences of the attempt. Although the injunction was not technically violated, the incident is indicative of defendant's attitude and persuasive on the question of the propriety of making the injunction permanent.

(c) The failure to file proper registration forms was a matter of much controversy at the trial. Practically all of the leases contain a discount clause. That is, the gross amount was specified as the monthly payment with a provision for a $5 discount if paid on or before a certain date of the month. On the registration forms in the spaces provided for the rent on March 1, 1942 (the base date if the premises were then rented) and for the "Maximum Legal Rent", defendant inserted the gross monthly payment and added "as per lease" without specific mention of the discount clause or its terms. As there is no space specifically provided for a discount clause, defendant contends there has been no violation and can be none until such a form is provided. Plaintiff contends, with justi-fication, that defendant's registrations do not disclose sufficient information to ascertain the ceiling. Defendant counters that there is no obligation to disclose the "net" rent and that "maximum" can mean only the "gross" rent.

Section 302(g) of the Act, 50 U.S.C.A. Appendix § 942(g), defines rent: "The term 'rent' means the consideration demanded or received in connection with the use or occupancy or the transfer of a lease of any housing accommodations."

Section 1388.293 (10) of Maximum Rent Regulation 53 (7 Fed.Reg. 8602) defines the term: "The term 'rent' means the consideration, including any bonus, benefit, or gratuity, demanded or received for the use or occupancy of housing accommodations * * *."

■ It should be apparent that the discount clause is part of the consideration received for rent within the meaning of these definitions and must be taken into consideration in determining the maximum rent where such an agreement was in effect on the maximum rent date. The situation could and should be disclosed on the registration form. This is not the insurmountable obstacle that defendant contends it is. For example, in the appropriate space the maximum monthly rental could be stated:

" $50.00
$45.00, if paid on or before the 5th of the month."

This is simple and clearly discloses the rental terms.

Enough has been recited to show that violations occurred. The remaining consideration is whether there is likelihood of their resumption if the present injunction is dissolved. The violations continued for four and one-half months, from the time the Act became effective until the temporary injunction issued. Although almost a year passed before this trial there was no evidence that defendant had refunded or intended to refund any of the overcharges. The attitude of defendant's president as exemplified by his testimony and by numerous letters and petitions over his signature is one of belligerence and antagonism toward everything connected with rent control. In writing letters to tenants above referred to he came perilously close to contempt of this court. There is nothing in this record to lead me to believe defendant will voluntarily comply with the act and

regulations. The situation is almost the antithesis of that described in Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754, where the violations were inadvertent and were corrected as soon as discovered and where every co-operation was given to the enforcing officials. In passing, as bearing upon many of the activities and some of the issues here involved, the court would suggest a reading of Henderson v. Morgan, D.C., 54 F.Supp. 441.

It is the opinion of this court that the injunction should be made permanent with an additional prohibition against evictions or attempted evictions, and an order that within sixty days registration forms be filed substantially in accordance with this memorandum.

## II. Restitution of Overcharges to Tenants.

Plaintiff seeks to have the order compel restitution of overcharges to all tenants excepting those who have commenced a triple damage action against defendant under section 205(e) of the Act. The question is squarely presented as to whether this court has the power to grant such relief in a suit by the Administrator. The question is a new one and no case in point has been called to my attention. Plaintiff relies principally upon an analogy to the enforcement provisions of the Fair Labor Standards Act as interpreted in Walling v. Miller, 8 Cir., 138 F.2d 629, reversing Fleming v. Miller, 47 F.Supp. 1004, decided by this court. That case involved a motion to vacate or modify a consent decree which included a provision for restitution of back wages to employees. This court modified only this part of the decree on the ground that section 16(b) of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 216(b), gave employees the exclusive right of action to recover unpaid wages and therefore there was a lack of jurisdiction to order restitution in a suit by the Administrator under section 17 of that Act, 29 U.S.C.A. § 217.

In reversing this holding the Circuit Court of Appeals, Walling v. Miller, supra, pointed out that at the time the consent decree was entered into this court had jurisdiction of both the parties and the subject matter; it was so found and defendants did not challenge this finding on appeal. Therefore, the inherent power of this court was not involved but only a question going to the merits, i.e., the Administrator's capacity as plaintiff. It was held that by entering into the consent decree, defendants had waived the right of the Administrator to attack the modifying order. A careful reading of the opinion leaves no doubt that the Circuit Court of Appeals did not decide or intend to decide that the Administrator was authorized to bring a restitution suit. It is even stated that the contention that he has no such authority "may be sound." 138 F.2d 632. That this was the intention of the court is shown by Judge Woodrough's concurring opinion. He was of the view that an employer was in violation of the Act as long as he wrongfully withheld wages due and that Section 17, 29 U.S.C.A. 217, giving the United States District Courts power to "restrain violations", included the power to order restitution. He points out that the Administrator represents the public interest, and that the employees also have a private right to recover back wages is immaterial. Plaintiff adopts this reasoning in the case at bar by way of analogy. But no analogy exists because the majority opinion does not hold that the right of restitution under the Fair Labor Standards Act is lodged in this court.

Section 205(e) of the Act, 56 Stat. 33, 50 U.S.C.A.Appendix § 925(e), provides a remedy which I believe was intended to be exclusive of other remedies. It is there provided that one who buys a commodity sold in violation of a price ceiling, other than in the course of trade or business (the definition includes tenants of housing accommodations in defense rental areas): "may bring an action either for $50 or for treble the amount by which the consideration exceeded the applicable maximum price, whichever is the greater, plus reasonable attorney's fees and costs as determined by the court."

If such buyer or tenant is not entitled to bring such action the Administrator is given authority to bring it on behalf of the United States. Congress was careful to provide that no landlord or seller of any commodity could violate price ceilings without subjecting himself to these stringent penalties. If it were the intent of Congress to give the Administrator the right to seek an order for restitution in a case where the purchaser or tenant also had a right of action for treble damages, section 205(e) would have been the logical section wherein to express such intent.

Plaintiff finally relies on the language of section 205(a) wherein the Ad-

ministrator is empowered: "[to] make application to the appropriate court for an order enjoining such acts or practices, or *for an order enforcing compliance* * * * and upon a showing * * * a permanent or temporary injunction, restraining order, *or other order* shall be granted without bond." 50 U.S.C.A.Appendix section 925(a). (Italics supplied).

Plaintiff argues that the italicized words are surplusage unless construed to refer to a type of relief corrective of past conduct as distinguished from the conceded power to enjoin future violations. In Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754, the meaning of this language was considered. The Supreme Court said: "Though the Administrator asks for an injunction, some 'other order' might be more appropriate, or at least so appear to the court. Thus in the present case one judge in the Court of Appeals felt that the District Court should not have dismissed the complaint but should have entered an order retaining the case on the docket with the right of the Administrator, on notice, to renew his application for injunctive relief if violations recurred. It is indeed not difficult to imagine that in some situations that might be the fairest course to follow and one which would be as practically effective as the issuance of an injunction. Such an order, moreover, would seem to be a type of 'other order' which a faithful reading of § 205(a) would permit a court to issue in a compliance proceeding." 321 U.S. 328, 64 S.Ct. 591, 88 L. Ed. 754.

In view of this language I do not believe an extension of the meaning of "other order" to include the kind of relief asked here is justified.

Defendant argues that granting restitution in this proceeding would be a denial of legal rights without a jury trial. There is some evidence in this case that in a treble damage action defendant may have valid counter-claims against certain tenants for damage to or theft of its property. The tenants are not parties to this proceeding. One might well pose the question: Could this court, without a jury, adjudicate the amount of restitution in each of the twenty rental units involved here, some of which have had several different tenants, without the tenants before it and without the defendant having an opportunity to interpose valid counter-claims as a defense?

My conclusion is that this court lacks the power to grant an order compelling restitution of overcharges to tenants at the suit of the Administrator. I therefore do not reach the question of the propriety of such an order under the facts of this case.

The permanent injunction will issue in accordance with the conclusions expressed in part I of this memorandum.

This memorandum is made a part of the findings of fact and conclusions of law which will be filed herein. Exceptions will be preserved to all parties aggrieved.