**BOWLES, Price Administrator, v. WARD et al.**

**Civil Action No. 4199.**

District Court, W. D. Pennsylvania.
April 25, 1946.

Thomas F. Garrahan, A. Morris Ginsburg, both of Pittsburgh, Pa., for plaintiff.

J. Wray Connolly, of Moorhead & Knox, all of Pittsburgh, Pa., for defendants.

WALLACE S. GOURLEY, District Judge.

This is an action brought by Chester Bowles, Administrator, Office of Price Administration, against Charles S. B. Ward, Arthur J. McCarthy and Norman L. Parkins, individually and as partners doing business as Wieman and Ward Company.

It is claimed by the Government that the defendants have violated the provisions of MPR 120, and recovery is demanded in the amount of $5827.23, which is three times the overcharge of $1942.41 which it is alleged was made, together with the granting of injunctive relief.

The case is now before the Court on motion filed by the plaintiff in accordance with the provisions of Rule 56 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, in which the plaintiff asks for the granting of summary judgment against the defendants.

At the time of argument, the Court permitted the introduction of testimony to clarify certain facts which were not clear from an examination of the pleadings. Rule 56(d), Federal Rules of Civil Procedure.

In the consideration of said motion, it was necessary for the Court to consider the following pleadings:

Complaint

Bill of Particulars

Answer

Amended Answer

The original Complaint and Bill of Particulars set forth that the defendants violated the Emergency Price Control Act of 1942, as amended by the Stabilization Extension Act of 1944, 50 U.S.C.A.Appendix, § 901 et seq., and Maximum Price Regulation 120.

It being more particularly claimed that the defendants purchased, sold and delivered bituminous coal in excess of the maximum prices prescribed by Section 1340.213 of Maximum Price Regulation 120. That the defendants failed to indicate on their invoices the name of the mine from which each shipment was made, the mine index number, and the size of the coal, all of which was in violation of Section 1340.205 (a) (3) of Maximum Price Regulation 120.

That during the period of one year immediately preceding the date of the filing of the Complaint, which was April 20, 1945, the defendants sold and disposed of bituminous coal in excess of the maximum ceiling prices in the amount of $1942.41, and that sales were made in the amount of $400.13 prior to said one year period.

It appears that prior to May 18, 1942, the effective date of the Act, and since then to the time of hearing on January 14, 1946, the defendants were and have been distributors of bituminous coal. In connection with their business, sales have been made of approximately 70,000 cars of coal, and this proceeding involves a transaction which comprised 125 cars of coal, or approximately 18/100 of 1% of the business conducted by the defendants since the effective date of the Regulation. It is admitted that the 125 cars of coal were sold at prices in excess of the maximum prices established by a previous mine index number issued for the mine where said coal was purchased, but it is contended that the defendants relied on the representations made to them by the producer of said coal that the prices charged were in accordance with the Regulation.

It is immaterial as to the amount of business done by the defendants or what percentage the basis for the Government's claim bears to the total business. If a responsibility exists on the part of the defendants to comply with the Regulation

which gives rise to the Government's claim for money damages, innocent nonconformity will not justify or excuse said neglect since such action is just as inflationary and damaging to competitors and the public as guilty nonconformity. Bowles v. Hall-Holliday, D.C., 62 F.Supp. 486; Brown, Admr. v. Hecht Co., 78 U.S.App.D.C. 98, 137 F.2d 689, 691; Bowles v. American Stores, Inc., 78 U.S.App.D.C. 238, 139 F.2d 377.

The defendants, who were solely distributors of bituminous coal, purchased the coal involved in this claim from the Lucas-Smith Coal Company. It so happens that both the producer and distributor involved herein had offices located in the City of Pittsburgh, Allegheny County, Pennsylvania. Also, the mine which produced the coal was located in Armstrong County, Pennsylvania, a short distance from the office of all parties. The Lucas-Smith Coal Company is solely a producer of coal, and there is no business relationship existing between the producer and distributor either financially or in the operation of either business.

Sometime prior to December, 1943, the Lucas-Smith Coal Company, the producer, arranged for the opening of what was described as "a new strip mine," to be known as the "Lucas-Smith Mine" in Washington Township, Armstrong County, Pennsylvania. Representatives of the Lucas-Smith Coal Company visited the location of the farm where the coal was to be stripped and found there had been an old pick mine on the farm which had been worked out 40 to 50 years before. The farm had formerly been owned by a person named Groves and, on inquiry by the producer, the Company was informed that no other person or company had ever made inquiry about the strip coal. The producer then agreed to lease the farm for the purpose of removing and stripping the coal.

The defendants learned that the Lucas-Smith Coal Company intended to strip said coal, and a representative of the defendants visited the premises to ascertain if the coal was of a quality that would satisfy their customers. It was also learned that the farm had never been touched by a previous stripper, and it was then agreed that the defendants would purchase the coal stripped by said producer.

Lucas-Smith Coal Company exhibited to the defendants the copy of a letter written to the Solid Fuels Branch, Office of Price Administration, Washington, D.C., dated December 17, 1943, in which a request was made for an index number for said stripping project. It was set forth in said letter the name of the mine closest to said project, together with said mine index number and the price of the coal per ton. Said producer also represented to the defendant distributor that the mine had never been opened before, and that pending a classification of the mine, it was proper to proceed with the mining and selling of the coal on the basis sold at the nearest mine in the same seam.

After the application was filed by the Lucas-Smith Coal Company, the Office of Price Administration raised inquiry pertaining to the type or seam of coal to be mined. Considerable correspondence then took place between the Lucas-Smith Coal Company and the governmental agency in connection therewith. However, the defendants did not learn of this fact until approximately all of the coal produced had been sold by the defendants, and in connection therewith the Court will later make comment.

According to the records in the office of District II of the Bituminous Coal Producers Association, which is situate in the City of Pittsburgh, Pennsylvania, considerable difficulty was also experienced in the proper classification of said mine.

In the proper classification of mines, the Solid Fuels Administrator of the Office of Price Administration communicated with the Secretary of the National Bituminous Coal Producers Industry Advisory Committee.

The practice is for the producer to file an application with the Solid Fuels Administrator, requesting a mine index number, in which the producer sets forth the type of coal that he believes is existing and he also sets forth, where the coal has not been heretofore indexed or classified, the mine index number of the mine nearest adjoining

with the same type of coal. In about a week or ten days after the application would be filed, the Office of Price Administration would send to District Number II of the National Bituminous Coal Producers Industry Advisory Committee a copy of said application. The Advisory Committee would then make an investigation and at a board meeting decide whether the application correctly set forth the facts as they actually existed. The Advisory Committee would fix the proper price and classification of the coal, and so certify to the Office of Price Administration at Washington, D. C. The Office of Price Administration, after the receipt of said certificate, would give the mine a certain index number and classification for said coal. If the Solid Fuels Administrator of the Office of Price Administration did not notify the producer of coal that the application filed had been disapproved within thirty days after the application was filed, then the producer had the right to proceed with the mining of coal on the basis of his application.

That during the period involved in the instant case, from February 23, 1944, to and including June 29, 1944, the practice above referred to was followed. Also, on some occasions distributors of coal would make inquiry to the Advisory Committee as to the mine index number or the classification of coal. However, the customary procedure was for the distributor to rely on the producer that the coal had been properly classified and the mine given a correct mine index number. If the producer was vague, or the distributor believed the producer was indefinite or not reliable, it was also the custom of the distributor to request the Advisory Committee for help.

If a distributor would have made inquiry from the Advisory Committee, all information available would have been given as to whether the coal had been properly classified and the mine given a proper index number. That on some occasions inquiry had been made by distributors to the District II Advisory Committee from Cleveland, Ohio, Youngstown, Ohio, and Buffalo, New York, but such action was not a common practice.

As a result of the confusion which existed in the coal industry, the Advisory Committee of District II, during the early part of 1945, started to send classifications of coal and the certification of mine index numbers to the distributors in the Pittsburgh District. This practice was not followed, however, during the period complained of in the case now before the Court.

The Advisory Committee referred to herein is composed of members of the coal industry, and there are no distributors of coal who are members of said Committee. The Committee serves without financial remuneration, and the Secretary of the Committee together with the expenses of the Committee are paid from assessments levied against the Western Pennsylvania Coal Operators Association. Also, this Committee serves the Government, as an accommodation or in an advisory capacity, to assist in the enforcement of such regulations as might be promulgated by the Office of Price Administration pertaining to the coal industry. This Advisory Committee was acting in the above capacity by virtue of the provisions of Section 2(a) of the Emergency Price Control Act of 1942.

In this case the mine in question, where the defendant distributor purchased its coal, was first given a mine index number on March 20, 1942. On that date the Advisory Committee certified to the Office of Price Administration, Coal Division, the classification of coal and mine index number on application of the Groves Coal Company, Groves Strip Mine. The Bituminous Coal Division at Washington, D. C., on April 20, 1942, set up the registration of said mine as Groves Coal Company, J. H. Christy, Groves Strip Mine, Lower Freeport Vein. That was listed in the records of the Bituminous Coal Producers Board, given general trade circulation, and published in the Federal Register.

The Lucas-Smith Coal Company, who was the producer in this case, made no inquiry from the Advisory Committee as to whether the acreage involved had been previously given a mine index number. However, since the Groves Mine had never been opened or operated, the Advisory Committee in the latter part of 1942 removed the mine index number and classification from the records of the Bituminous Coal Producers.

That when the mine was previously classified on March 20, 1942, the Advisory Committee had the acreage inspected, but the same individual was not employed by said Committee when the Lucas-Smith Coal Company filed application in the early part of 1944. The Advisory Committee first learned of the Lucas-Smith Coal Company application on January 24, 1944, when a letter was received from the Price Executive of the Solid Fuels Branch of the Office of Price Administration. On the basis of the application filed by the Lucas-Smith Coal Company that the acreage had not been previously operated, a mine index number had been temporarily assigned by the Office of Price Administration to said producer.

The Advisory Committee was asked to make a recommendation in connection with the application filed by the Lucas-Smith Coal Company, and an inspector was sent to examine the acreage who certified it was a new mine. A controversy arose as to whether the seam of coal was Freeport or Kittaning, and the Committee requested the person who was inspector in 1942 to view the premises. This inspector reported the acreage was the same which he had inspected in March of 1942. As a result thereof, the Committee on April 20, 1944, advised the Solid Fuels Branch of the Office of Price Administration that the mine had been previously classified and given a mine index number. It also appears that if the Advisory Committee had not raised a question as to the seam of coal involved, the application originally filed by the Lucas-Smith Coal Company would have been approved by said Committee and the Office of Price Administration. On May 2, 1944, the Lucas-Smith Coal Company was advised of the correct classification by the Office of Price Administration, and a similar letter was sent to the Advisory Committee in which it was set forth that their recommendation had been approved.

As a result of the foregoing, the earliest date on which the Advisory Committee could have given the defendants in this proceeding the correct classification and mine index number was April 20, 1944.

The producer then endeavored to secure a reclassification of said coal, and during this period of time the defendants first became suspicious or aware that some question had been raised as to the ceiling price for the coal being purchased. Representatives of the defendants then communicated with the Price Executive of the Solid Fuels Branch on June 19, 1944, and on June 22, 1944, the Price Executive advised the defendants as to the correct ceiling prices.

On the 18th day of July, 1944, the defendants were notified by the Lucas-Smith Coal Company that the sale price was less than previously classified. As a result of relying on the previous classification made on the application filed by the producer, the coal had been purchased and resold by the defendants in excess of the ceiling prices provided by the previous mine index number and classification.

Immediately upon receipt of this information, the defendants had their account adjusted with the Lucas-Smith Coal Company so as to obtain proper credit for the overcharges, and began a review of their invoices with the persons to whom the coal had been sold. The defendants then proceeded to credit their respective customers with the amount of overcharge which had been made, and all repayments or credits were completed some time before this Complaint was filed on April 20, 1945.

On the basis of the above facts, it is contended by the Government:

That the Court should enter judgment against the defendants for the amount of $5827.23, which is three times the overcharge of $1942.41 made during the period of one year before the Complaint was filed on April 20, 1945;

That the claim for the overcharges made during the period more than one year prior to the filing of the Complaint, in the amount of $400.13, should be dismissed as far as money damages are concerned, but should be considered by the Court as a basis for injunctive relief;

That the defendants have failed to prove that their actions were not willful, or that practicable precautions were taken to comply with the Regulation;

That the defendants failed to keep records as provided by said Regulation;

That a permanent injunction should be issued against the defendants, restraining

them from future violations of Maximum Price Regulation 120, or any other regulation of the Office of Price Administration which presently or in the future may apply to commodities purchased or sold by the defendants.

The defendants contend:

That the prices paid for the coal purchased were on the basis of representations made by the Lucas-Smith Coal Company;

That the prices charged for the coal sold by the defendants were on the basis of the classification certified to the defendants by the Lucas-Smith Coal Company;

That the defendants were not obligated to ascertain whether or not the Lucas-Smith Coal Company had complied with the Regulation;

That the claim for injunctive relief should be denied.

Therefore, the primary question for consideration is: Is a distributor of coal, before coal is purchased from a producer and then resold, required under the provisions of Maximum Price Regulation 120 to ascertain that compliance has been made with the Regulation?

It is necessary to first consider the various regulations which have application to the distributors of coal, and then conclude whether under all the allegations set forth in the pleadings the plaintiff is entitled to recover against the defendants.

Under the provisions of Maximum Price Regulation 120, it is provided, inter alia, as follows:

Section 1340.201. "On and after May 18, 1942, regardless of the terms of any contract, agreement, lease, or other obligation, no person who is a producer or a distributor shall sell or dispose of bituminous coal for delivery from a mine or a preparation plant operated as an adjunct of a mine or mines, and no person shall in the course of trade or business *buy or receive bituminous coal* so delivered at prices higher than the maximum prices established by said Regulation."

Section 1340.204. "The price limitations set forth in this Maximum Price Regulation 120 shall not be evaded, whether by direct or indirect methods, in connection with an offer, solicitation, agreement, sale, delivery, purchase or receipt of or relating to bituminous coal alone or in conjunction with any other commodity or by way of commission, service, transportation, or other charge, or discount, premium or other privilege, or by tying-agreement or other trade understanding, or by the making of excessive charges for trucking or otherwise."

Section 1340.205. "Persons selling bituminous coal subject to this Regulation shall keep the following records for as long as the Regulation is in effect, or for so long as the Emergency Price Control Act of 1942, as amended, shall permit, which ever is the longer, but in no event to exceed two years.

"As applys to distributor:

"a. Copies of all shipping records or daily billing sheets.

"b. Within 45 days after date of shipment give each purchaser of coal an invoice showing, the name and address of the producer; the name of the mine or mines from which the coal is shipped, and whether he is acting as sales agent or distributor in the sale involved.

"c. The invoice shall state the date of shipment; the name and address of the seller, of the buyer and of the consignee, if known; the destination; the name of the mine or the trade name of the coal, and mine index number of the mine or mines from which shipment is made; the tonnage shipped; the per net ton price charged f.o.b. the mine, and the producing district number in which the mine is located, also the carrier method."

Section 1340.207. "The administrator may by order grant an *adjustment of maximum prices to any producer* who shows to the satisfaction of the administrator that the sale of its mine's entire production at the maximum prices would return a realization less than the mine's representative costs of production."

Section 1340.208 defines, inter alia, "Distributor":

"Distributor means a person who purchases bituminous coal for resale, and resells the same in not less than cargo or railroad lots, as more fully defined in the Bitu-

minous Coal Act of 1937, as amended, and rules and regulations issued thereunder, in effect as of midnight August 23, 1943, and any person acting as an agent of such distributor in the sale of bituminous coal."

Section 1340.210. "Sub-section 2—The maximum prices established herein shall apply to all sales by a producer or *distributor* at, or *for* delivery from, a mine or a preparation plant operated as an adjunct of a mine."

Section 1340.210. "Sub-paragraph 6— Prior to the sale of bituminous coal for which price classifications or maximum prices have not been established, the *producer thereof shall file with the Price Administrator* an application for specific maximum prices or price classifications, or both. The producer shall state the mine index number, if any, and the classifications, if any, assigned by the Bituminous Coal Division to the mine and coals involved, along with the name, location and mine index number of the nearest mine in the same seam, the coals of which are classified and sold subject to specific maximum prices along with such classifications and prices.

"For thirty days after filing the application, such coals shall be sold at temporary maximum prices established by this Regulation for the coals which are produced at the nearest mine in the same seam or in a substantially similar seam, and which are classified and sold subject to specific maximum prices.

"After thirty days from the filing of the application, if no prior action has been taken by the Administrator, the classification and prices as requested in the application shall be the classifications or maximum prices, or both, for such coals."

It is a known fact that distributors sell approximately 11% of all bituminous coal produced in the country, and it was definitely the intention of this Regulation to prohibit distributors from selling coal at prices higher than the maximum prices set forth in the Regulation.

I have considered the Regulation and all its provisions, the statements for consideration, and the interpretations of the Administrator. I have been unable to find any reference which places any responsibility on a distributor to file application with the Office of Price Administration to make positive that a coal field has been properly classified or given an appropriate mine index number. Also, there was no settled custom existing in this area at the time of the alleged violations which would place distributors on notice that this information could be secured through communication or inquiry to the Advisory Committee, Section II, National Bituminous Coal Producers' Industry.

However, Section 1340.201, inter alia, provides that *no person who is a producer or a distributor shall sell, dispose of, buy or receive* bituminous coal at prices higher than the maximum prices established by Maximum Price Regulation 120.

On the basis of the above matters, the Government contends that the defendants could have easily made inquiry and obtained accurate information concerning the history of the mine, its proper mine index number, and the proper ceiling prices for said coal. Communication could have been had with the owner of the land, the Grove heirs. That the defendants had ample means of informing themselves of the Regulation through reference to the Federal Register, the contents of which are, by Federal Statute, constructive notice to all persons affected thereby.

Rule 9 of Procedural Regulation No. 1, issued by the Administrator shortly after he took office, states that a person is subject to a provision of a maximum price regulation only if such provision prohibits or requires action by him. This interpretation of the Act has been held reasonable. United States v. American Trucking Associations, 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed. 1345.

It seems harsh to state that a distributor of coal is obligated to make positive that the coal which he purchases is not being sold by a producer in violation of any regulation which governs said commodity. I furthermore realize that the necessity of such action would involve the expenditure of considerable time, effort, inquiry and financial commitments. However, the Administrator has seen fit to provide that no person shall buy, sell, dispose of, or receive

bituminous coal at prices higher than the maximum prices established by the Regulation.

Interpretations of maximum price regulations by the Price Administrator should be given great weight, and this Court is not authorized to deny enforcement of said Regulation regardless of my personal views as to the unreasonableness of the Order. That is a matter within the exclusive jurisdiction of the Emergency Court of Appeals, or the Supreme Court on review of that Court. 50 U.S.C.A.Appendix § 924(a); Bowles v. Meyers et al., 4 Cir., 149 F.2d 440; Bowles v. Ruby et al., D.C. 62 F.Supp. 289.

The words which appear in Section 1340.201 of said Regulation "no person who is a producer or a distributor shall sell, dispose of, buy or receive bituminous coal at prices higher than the maximum prices established" have distinct meanings. It must, therefore, be presumed that Congress, in enacting said statute making it unlawful to sell or deliver in violation of the price schedule which applied to coal, used such words according to their ordinary and usually accepted meaning. Schreffler et al. v. Bowles, 10 Cir., 153 F.2d 1.

The motion for summary judgment provided by Rule 56 of the Federal Rules of Civil Procedure is to permit the speedy and expeditious disposal of cases where pleadings do not as a matter of fact present any substantial questions for determination. It appears in this case there are no genuine issues for trial, and under the pleadings and testimony which has been offered in explanation therefor, the motion for summary judgment should be granted. Schreffler et al. v. Bowles, 10 Cir., 153 F.2d 1; Purity Cheese Co. v. Frank Ryser Co. et al., 7 Cir., 153 F.2d 88; Engl v. Aetna Life Ins. Co., 2 Cir., 139 F.2d 469.

On a motion for summary judgment, it is the duty of the party litigants to fully disclose all evidence which sheds any light in explanation of the allegations which appear in the pleadings. This was done in this case, and the Court furthermore proceeded to hear evidence in accordance with the provisions of Subsection (d) of Rule 56, Federal Rules of Civil Procedure. Carr v. Goodyear Tire and Rubber Co., Inc., D.C., 64 F.Supp. 40.

It is, therefore, necessary to now consider the nature of the judgment or relief which should be entered in favor of the complainant against the defendants.

The defendants claim that reliance was placed on the Lucas-Smith Coal Company as a producer, that it had complied with the Regulation. The good faith of the defendant is not a complete defense to the action for damages or injunctive relief. However, the good faith provision in Section 205(d) of the Act, 50 U.S.C.A.Appendix § 925(d), refers only to action taken in reliance upon and in conformity with an official interpretation by the Office of Price Administration. Schreffler et al. v. Bowles, 10 Cir., 153 F.2d 1.

Furthermore, even if the defendants had been advised by the Advisory Committee of District II, Bituminous Coal Industry Committee, or a representative of the Office of Price Administration, it would not have relieved the defendants of liability.

The administrator has prescribed a reasonable procedure by which persons subject to the regulations may obtain official interpretations. Such interpretations must be in writing and signed by an authorized person, and regardless of the harshness of this ruling, it is obvious that the Administrator cannot be bound by various interpretations which happen to be made by employees of the Administrator or other persons governed by the Regulation. Bowles v. Lentin, 7 Cir., 151 F.2d 615; Wells Lamont Corp. v. Bowles, Em.App. 149 F.2d 364; Utah Power and Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed 791; Schreffler et al. v. Bowles, 10 Cir., 153 F.2d 1.

It is also the duty of the defendants to prove by a preponderance of the evidence that the violation of the regulation was neither willful nor the result of failure to take practicable precaution against the occurrence of the violations if it is desired to be relieved of a penalty of more than the amount of the overcharge. Bowles v. Goebel, D.C., 58 F.Supp. 686.

■ The word willfully "is a word of many meanings" depending upon the context in which it is used. Spies v. United States, 317 U.S. 492, 63 S.Ct. 364, 367, 87 L.Ed. 418.

It denotes that which is intentional or knowing, or voluntary, as distinguished from accidental, and that it is employed to characterize conduct marked by careless disregard whether or not one has the right to so act. United States v. Illinois Central R. R. Co., 303 U.S. 239, 58 .S.Ct. 533, 82 L.Ed. 773; United States v. Murdock, 290 U.S. 389, 54 S.Ct. 223, 78 L.Ed. 381; Zimberg et al. v. United States, 1 Cir., 142 F.2d 132.

■ The word practicable precaution does not mean possible, but means feasible, fair and convenient. . That it is capable of being done with the exercise of reasonable care, inquiry or caution. In re Philadelphia & Reading Coal & Iron Co. (Appeal of Schrager et al.) 3 Cir. 104 F.2d 126.

■ The lack of willfullness or the failure to take practicable precautions does not afford complete immunity to the violation, since innocent nonconformity with the Price Control Act is as inflationary and as damaging to competitors and the public as guilty nonconformity. Bowles v. Krodel, 7 Cir., 149 F.2d 398; Bowles v. Sharp, 8 Cir., 149 F.2d 148; Brown v. Hecht Co., 78 U.S.App.D.C. 98, 137 F.2d 689; Bowles v. American Stores, Inc., 78 U.S.App.D.C. 238, 139 F.2d 377.

■ Furthermore, the fact that the defendants have refunded the overcharges does not relieve them from liability. Since this would have been true even if an agreement had been entered into with their customers to this effect before the sales were made. Bowles v. Hall-Holliday, D.C., 62 F.Supp. 486.

The conduct of the defendants clearly indicates that their actions were not willful but, in straining the imaginative powers of the Court, I cannot reason how it could be construed that practicable precautions were taken by the defendants to comply with the Regulation.

■ ■ Even if the defendant fails to prove that practicable precaution was taken to comply with the regulation, it is discretionary with the Court to enter judgment for the amount of the overcharge or for an amount not more than three times the amount of the overcharge. In other words, the Court in its discretion can enter judgment for an amount between the minimum and maximum provided by the Emergency Price Control Act where the defendant has failed to prove both lack of willfullness and failure to exercise practicable precaution. Bowles v. Krodel, 7 Cir., 149 F.2d 398; Bowles v. Hasting, 5 Cir., 146 F.2d 94; Bowles v. Ammon, D.C., 61 F.Supp. 106; Bowles v. Goebel, D.C., 58 F.Supp. 686; Bowles v. Hall, D.C., 62 F.2d 486.

In the past, it has been the practice of this Court to enter judgment for double the amount of the overcharge where the defendant has failed to prove the exercise of practicable precaution to comply with the regulation. However, in this case we are faced with very extenuating circumstances that place these defendants in an entirely different category.

Representatives of the defendants visited the location of the mine and found it had not been previously operated, and a letter was exhibited to the defendants by the producer from the Solid Fuels Administrator for the classification of the coal and the issuance of a mine index number. These actions indicate some precaution being taken, but, in my judgment, it was not the practicable precaution intended by Congress. The defendants are really the victims of circumstances in placing such great reliance on the representatives of the Lucas-Smith Coal Company. This is an impelling force but not sufficient in law to relieve them of liability.

■ The Court, therefore, believes that judgment should be entered in favor of the Office of Price Administration on behalf of the United States against Charles S. B. Ward, Arthur J. McCarthy and Norman L. Parkins, individually and as partners doing business as Wieman and Ward Company, defendants, in the amount of $2250 together with the costs of this proceeding.

■ It is necessary that the defendants realize in the future that they must comply with all rules and regulations adopted by

the Office of Price Administration, and it is, therefore, the belief of the Court that the request of the Government for injunctive relief should be granted.

The success of the war against inflation is dependent upon the patriotic cooperation of all persons to whom it is applicable, and the Court should not consider the controversy as existing merely between an agency of the Government and a defendant. Brown v. Hecht Co., 78 U.S.App.D.C. 98, 137 F.2d 689, 695; Henderson v. C. Thomas Stores, D.C., 48 F.Supp. 295, 301.

The Administrator does not carry the sole burden of the war against inflation, and the courts should not, therefore, administer any part of the Act grudgingly. It should be administered by the courts with their due share of responsibility, and the discretion permitted to be exercised by the courts should be in the light of the large objectives of the Act. That of all the consequences of war and now our period of post-war readjustment, inflation is the most destructive. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754; Bowles v. Montgomery Ward and Company, 7 Cir., 143 F.2d 38.

In the enforcement of the Price Control Act, the Court should, therefore, exercise its discretion in the light of the standards of public interest. If the public interest is to be protected and the statute is to have its full and proper deterring effect on prospective wrongdoers, a defendant must be discouraged from failure to comply by the imposition of an appropriate penalty. Hecht Co. v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L.Ed. 754; United States v. Morgan, 307 U.S. 183, at page 194, 59 S.Ct. 795, 83 L.Ed. 1211.

It is a definitely settled rule of law that a discontinuance of practices complained of does not prevent the issuance of an injunction to restrain the offender from violating the provisions of said Regulation in the future. Henderson, Administrator, OPA v. Baldwin et al., 54 F.Supp. 438.

It is, therefore, the opinion of the Court that injunctive relief should be granted in favor of the Office of Price Administration against the defendants, Charles S. B. Ward, Arthur J. McCarthy and Norman L. Parkins, individually and as partners doing business as Wieman and Ward Company, for the following reasons:

(a) From February 23, 1944, to July 7, 1944, inclusive, the defendants sold bituminous coal but failed to keep records showing the size of coal on no less than 90 transactions, failed to keep records showing the mine index number in no less than five transactions, and failed to keep records showing the name of the mine in at least one transaction, in violation of Section 1340.205 of MPR 120;

(b) From February 23, 1944, to May 31, 1944, inclusive, the defendants as distributors made no less than 37 purchases of bituminous coal at prices which were in excess of the ceiling prices therefor established under Section 1340.213 of MPR 120, and in violation of Section 1340.201 thereof;

(c) From April 25, 1944, to June 1, 1944, inclusive, the defendants as distributors made no less than 74 sales of bituminous coal at prices which were in excess of the ceiling prices therefor established under Section 1340.213 of MPR 120, and in violation of Section 1340.201 thereof; and that the amount of said overcharges which occurred within the period of one year immediately preceding the date of the filing of the complaint in this case, totalled $1942.41; said sales were made to purchasers for use or consumption in the course of trade or business;

(d) From February 23, 1944, to April 19, 1944, inclusive, the defendants as distributors made no less than 13 sales of bituminous coal at prices which were in excess of the ceiling prices therefor established under Section 1340.213 of MPR 120, and in violation of Section 1340.201 thereof; and that the amount of said overcharges, which occurred more than a year prior to the date of the filing of the complaint in this case, totalled $400.13, said sales were made to purchasers for use or consumption in the course of trade or business.

An appropriate order directing the entry of judgment, and the granting of the injunctive relief will be filed with this Opinion.