THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* FELIPE LÓPEZ LUGO ET AL., Defendants and Appellants.

Nos. 12191–94. Argued June 27, 1947.—Decided July 16, 1947.

---

[1] *Land Authority* v. *Registrar,* 62 P.R.R. 483.

586

*Jorge L. Córdova, Philip Montalvo, Héctor Reichard, and Oscar Souffront* for appellants. *Luis Negrón Fernández, Attorney General,* and *Joaquín Correa Suárez, Assistant Prosecuting Attorney,* for appellee.

Mr. Justice Snyder delivered the opinion of the Court.

Felipe López Lugo, a wholesale merchant of San Sebastián. and two of his employees. Pedro Olivencia and Ramón Bonilla, have appealed from four judgments of the District Court of Aguadilla, sentencing them for alleged violations of the Insular Supplies Act and Administrative Order No. 8 issued pursuant thereto.

The defendants were charged with billing four retail merchants for more lard than was delivered to them in connection with sales thereof, which in turn resulted in payment therefor at prices higher than that fixed by the General Supplies Administrator. López was a defendant in all four cases. In three of them his co-defendant was Bonilla and in the fourth, Olivencia.

The cases were tried together in the district court, and the defendants were convicted. López was sentenced to two years and nine months in jail and to pay $14,000 in fines for the four offenses. For three offenses, Bonilla was sentenced to one year in jail an $1,100 in fines. Olivencia was sentenced to three months in jail and to pay a $500 fine for one offense.

The appeals in the four cases were likewise heard together. The defendants contend that the lower court erred (1) in finding that the defendants had delivered less lard than was shown in the invoices; (2) in finding that the three defendants willfully made out invoices for amounts different from those delivered; (3) in overruling demurrers to the informations; and (4) in inflicting cruel and unusual punishments and imposing excessive fines in violation of § 2 of the Organic Act.

In examining the first error, we find there is no dispute as to the circumstances surrounding the transactions. On Friday, August 9, 1946, during a period of acute shortage of lard in Puerto Rico, López telephoned the Mayor of San Sebastián, who was also Chairman of the local Supplies Board. He told the Mayor he was the only person in town who had received lard; that there was a large crowd at his establishment; and that he was apprehensive of the difficulties and disturbances which might arise if he attempted to distribute the lard among all these people. He asked the Mayor, as Chairman of the local Board, to take charge of the distribution of the lard, offering to make a gift of the lard in order that the Board might distribute it. The Mayor refused both the offer of the lard and to take charge of its distribution.

López thereupon sent for a policeman to maintain order while the lard was being sold. All the sales were then made in the presence of this policeman. Olivencia, an employee of López, took the orders, prepared the invoices and received payment for the lard, after which he delivered the invoices to the purchasers. The latter then took the invoices to Bonilla and three other employees of the defendant, who delivered the lard by placing it in empty cans which the purchasers themselves supplied. This division of labor between Olivencia and Bonilla and the others was the regular custom of the establishment.

Nobody complained to López, to the policeman or to anyone else that his lard was underweight. However, four retail merchants, when they left the establishment of López, went to other places to weigh their cans full of lard. According to them, the scales of the other establishments showed that the weight of their lard was short. They never explained how they reached this conclusion, since they reweighed the full cans without determining and subtracting therefrom the weight of their empty cans.

These four retail merchants went to the municipal building to complain to the Mayor. They left their cans of lard until Monday, August 12 in a place in the municipal building where many people freely came and went. Before he put his can of lard in the municipal building, one of the purchasers had already left his can in a shoe repair shop for an hour and a half while he did some errands.

On August 12 a municipal inspector of weights and measures, the Mayor, a policeman and the four purchasers gathered to conduct an experiment. First they weighed an empty lard can, which had a lid, and which is hereinafter called X can. There is no evidence as to where X can came from. They found it weighed $3\frac{1}{4}$ lbs. Thereafter they proceeded on the unestablished assumption that the empty cans utilized by the four retail merchants to take delivery of the lard they had purchased weighed the same—$3\frac{1}{4}$ lbs.—as X can. The four purchasers then deducted $3\frac{1}{4}$ lbs. from the gross weight of their four full cans. By this process they arrived at the conclusion that the lard, although sold to them as lard weighing 26, 28, 24 and 12 lbs., actually weighed, in the case of the first two, 2 lbs. less, and in the case of the other two, $1\frac{1}{4}$ lbs. and $\frac{3}{4}$ lb. less than the weight indicated in their invoices. This according to them was exactly the same shortage for each can of lard which was shown on the previous Friday on the scales of three different merchants.

The four purchasers and the others conducting this experiment assumed that X can and the four empty cans used to take delivery of the lard weighed the same despite the fact that the four cans were somewhat different from each other and from X can. The testimony was conflicting as to these differences. Although those present at the experiment took notes as to the weights and names of the purchasers, they made no notes as to these differences.

Both the inspector and the policeman testified that one of the four cans had a wooden handle. The inspector said that one can was yellow and that the other three were zinc. It was conceded that X can had a lid, but the witnesses for the government differed as to whether one, two or three of the four cans had no lid. Although there was testimony that the four cans and X can were the same size and class, the witnesses did not know if X can and one or more of the four cans were manufactured by the same firm or were of the same thickness.

One of the four purchasers testified that when he received his lard from Bonilla his can was clean and there was no lard on the outside. Yet when the four cans were weighed in the experiment conducted three days later—after they had remained for those three days in a public building to which the public had free access during a time when lard was extremely scarce—according to both the inspector and the policeman, they were "smeared with lard", "they seemed to be dirty", and were "spotted with lard".

This was the testimony for the government. On behalf of the three defendants, a merchant testified that he bought lard at the establishment of López on August 9, 1946 and received the correct weight. It was stipulated that ten merchants would testify to the same effect. The policeman who was there to preserve order testified that nobody complained to him and that he had observed nothing illegal.

López, his two employees and the policeman testified that hundreds of merchants bought lard that day, and that nobody complained of any error in weight or price. Olivencia corroborated the testimony of the government that he only prepared invoices and had nothing to do with weighing and delivering the lard, which was done by Bonilla and three other employees. Bonilla testified that he and three other employees weighed and delivered the lard, that he had delivered complete weight to all the purchasers on August 9 and that nobody complained.

Neither from The People's nor from the defendant's testimony does it appear that López participated in any of the four sales involved herein, except that Olivencia testified that he noticed that there had been a mistake in calculating the price of the lard sold to one retail merchant and because he was very busy he gave the invoice to López in order for the latter to re-calculate it, which he did.

There is considerable basis for the contention that the government did not establish beyond a reasonable doubt that the defendants delivered less lard to the four retail merchants than their invoices indicated. This charge involves a merchant who wished to make a gift instead of selling lard and who had no personal intervention in these transactions. Another defendant, Olivencia, had nothing whatsoever to do with weighing; he merely performed his regular and customary duty of making out invoices and collecting for purchasers. Bonilla swears he gave correct weights to all the purchasers. Many others who purchased that day corroborate his testimony. The government's case is based almost exclusively on a dubious experiment performed three days after the sale in which the lard as such was never separately weighed and in which the weight of the cans belonging to the purchasers was considered as weighing the same—3¼ lbs.— as X can, with no satisfactory showing that the four cans and X can actually weighed the same. The four cans of lard re-

mained in a public place for three days at a time when everyone in Puerto Rico was frantically attempting to obtain lard. And the government's own witnesses indicated that the appearance of these cans showed the lard had been tampered with during these three days. Cf. *People* v. *Garcia,* 47 P.R. R. 640; *Zimberg* v. *United States,* 142 F.(2) 132, 135 (C. C.A. 1st, 1944).

Nevertheless, we are reluctant to interfere with the findings of fact of the district court. In view of the result we reach in our discussion of the second error, we therefore assume without deciding that the lower court was justified in finding that the four cans of lard weighed an undetermined amount less than the invoices indicated.

 In the second error the defendants contend that even assuming the lard weighed less than the invoices indicated, there was no showing that the defendants willfully made out invoices for amounts different from those delivered.

The statute involved herein, Act No. 228, Laws of Puerto Rico, 1942 (p. 1268), as amended by Act No. 493, Laws of Puerto Rico, 1946 (p. 1474), was copied substantially from the Federal Emergency Price Control Act of 1942. *Ex parte Irizarry,* 66 P.R.R. 634. Both § 13 of our Act and § 205 of the Federal Act, 50 U.S.C.A. App. § 925, provide for other sanctions, such as cancellations of licenses, injunctions and civil suits for triple damages where violations thereof are not willful, see *Hecht Co.* v. *Bowles,* 321 U. S. 321; only in the event of a willful violation may the penal sanctions of the Federal and insular Acts be invoked. *Yakus* v. *United States,* 321 U. S. 414, 435; *United States* v. *Renken,* 55 F.Supp. 1, 3 (Dist.Ct., S.C., 1944); *Compañia Importadora, etc.* v. *Caldwell & Co.,* 58 N.Y.S.(2d) 745, 750 (1945); *Husers* v. *Papania,* 22 S.(2d) 755, 757 (La. 1945).

It therefore becomes important to determine the content of the adjective "willful". This is a word "of many meanings, its construction often being influenced by its context."

*Screws* v. *United States*, 325 U. S. 91, 101. However, the problem is not unduly difficult here, as the Federal statute from which our Act was copied has been judicially interpreted. The use of "willful" in the penal provision of our statute does not make it necessary to prove a specific criminal intent to commit the offense; that is to say, "willfully" does not mean "malevolently" or "with evil intent". On the other hand, neither is the other extreme true: the offense is' not spelled out, as in the case of adulteration of milk, merely by showing that the facts occurred; namely, the milk was adulterated, or as here the lard weighed less than the invoice showed. See *People* v. *Vázquez*, 26 P.R.R. 13; *People* v. *Díaz*, 62 P.R.R. 129.[1] Rather in its use of "willful" this statute occupies the middle ground: although no specific evil intent or malevolence is required, the offense, to be willful, must be intentional, knowing, deliberate or obstinate, as distinguished from accidental, mistaken or unknowing. *Zimberg* v. *United States, supra*, 137–8; *Kempe* v. *United States*, 151 F.(2d) 680, 688 (C.C.A. 8th, 1945); see *The People* v. *Giraud*, 23 P.R.R. 492, 496; *State* v. *Lindberg*, 215 Pac. 41, 45 (Wash. 1923). Cf. *Bowles* v. *Ammon*, 61 F.Supp. 106, 117 (Dist.Ct., Neb., 1945); *Bowles* v. *Ward*, 65 F.Supp. 880, 890 (Dist. Ct., Pa., 1946); *Bowles* v. *Krasno Bros. Glove & Mitten Co.*, 59 F.Supp. 581, 583 (Dist. Ct., Wis., 1945); *Bowles* v. *Pechersky*, 64 F.Supp. 641, 645 (Dist. Ct., Pa., 1946). And it should be noted that intent, which is a state of mind, may sometimes be deduced from the circumstances, the theory being that a person intends the ordinary consequences of his voluntary acts. Cf. *People* v. *Sánchez*, 60 P.R.R. 105, 107.

Perhaps the district court mistakenly believed that Ló-

---

[1] The *Díaz* case is distinguishable precisely because it arose under Act No. 6, Laws of Puerto Rico, 1941, Special Session (p. 14), which did not require that a merchant, to be punished criminally for an offense such as that involved herein, shall commit it willfully. The Legislature chose, in so far as criminal sanctions are concerned, to change from the previous absolute standard found in Act No. 6 of 1941 to the test of willfullness set up in Act No. 228 of 1942 as copied from the Federal Act of 1942.

pez and his two employees who intervened in these transactions must automatically be found guilty on a bare showing as in the case of adulteration of milk that the lard was underweight. But the statute herein provides that there must be something more: a showing of willful violation, that is, an intentional, knowing, deliberate or obstinate violation.

■■ When we apply this concept of willful violation to the facts of the instant case, we find no basis for the convictions of López. We wish to make it clear that the mere fact that López did not personally participate in these transactions would not in itself under Act No. 228 exculpate him from criminal liability under other circumstances. On the other hand, unlike the adulteration of milk cases, he is not absolutely liable, whether or not he participated. Rather the test when he does not participate personally is whether there is some evidence, either direct or circumstantial, tending to show that his employees intentionally or deliberately violated the law pursuant to his direction, or with his approval or acquiescence. Here there was not such testimony or circumstances. On the contrary all the evidence of the government and the circumstances demonstrate his desire to get rid of this lard without getting into any difficulty with the crowd which was clamoring for it. In effect, López was convicted for being owner of an establishment at which lard was sold underweight. But Act No. 228, as we have seen, does not make that a crime, in the absence of a willful violation on his part.

In the same way, the conviction of Olivencia cannot be upheld. He simply made out invoices and collected for the lard. He did not participate in the weighing and delivery of the lard. Indeed, there is no testimony that he even knew Bonilla was delivering lard underweight. The government argues that the division of labor between Olivencia and Bonilla was part of a scheme deliberately contrived to insulate López and Olivencia from criminal liability. This point

228 must be swift, sure and severe. But it is not the function of the courts to yield to mass hysteria and to crucify the innocent.

The judgments of the district court will be reversed and new judgments will be entered acquitting the defendants.