## UNITED STATES v. SAUNDERS et al.

### Civ. A. No. 5604.

United States District Court
W. D. Oklahoma.

July 2, 1953.

Leonard L. Ralston, Asst. U. S. Atty., Oklahoma City, Okl., for plaintiff.

Robinson & Oden, Altus, Okl., for defendant.

WALLACE, District Judge.

The plaintiff, the United States of America, brings this action against the defendants, Orville B. Sanders and Clifford Gordon, co-partners doing business as Southwest Metal and Trade Company, to recover damages for the over-ceiling *sale* or *delivery* of battery lead scrap. The Government contends that between October 2nd and October 20th, 1951, the defendants violated the Defense Production Act and applicable ceiling price regulations in eight separate instances.[1]

The defendants admit consummating two sales, one on October 2 and one on October 6, 1951, at prices which turned out to be in excess of the ceiling price, but insist that the remaining six transactions assailed by the Government which took place between October 13 and October 20, 1951, were mere bailments; and, that the defendants did not "sell or deliver" the scrap lead in question for $0.19 per pound within the meaning of said Act and regulations until after the date the ceiling price was raised to $0.19 per pound. The defendants argue that although the six loads in dispute were hauled to and unloaded at Dallas, Texas, at the time when the applicable ceiling was only $0.17 per pound, that neither the defendants nor the purchaser were aware that such was the ceiling price, but both sincerely believed the ceiling to be $0.19 per pound; that when both parties discovered there was some question on the proper ceiling price they orally agreed that no sale would be negotiated until such time as the actual ceiling price could be conclusively determined; that when the purchaser informed the defendants that the purchaser could not lawfully pay $0.19 per pound it was orally agreed that the defendants could leave the scrap lead in temporary storage at the place of business of the purchaser until such time as the parties could agree on a sales price; and, that if subsequently the parties could not agree on a settlement price which would meet the approval of the Office of Price Stabilization the purchaser was to return "similar material" to the defendants.

From the introduced evidence the Court finds the following:

(1) On October 2, 1951, the defendants sold and delivered to the Eagle-Picher Company of Texas, 36,110 pounds of battery lead scrap for $4,286.26; the price received was $527.21 over ceiling.[2]

(2) On October 6, 1951, the defendants sold and delivered to the Eagle-Picher Company of Texas 37,560 pounds of battery lead scrap for $4,409.54; the price received was $544.62 over ceiling.[3]

(3) On October 13, 1951, the defendants delivered to the Eagle-Picher Company of Texas 37,830 pounds of battery lead scrap. Subsequently, the defendants were paid $4,392.06 for this load; the price received was $544.75 above the ceiling price in effect at the time of delivery.[4]

(4) On October 16, 1951, the defendants delivered to the Eagle-Picher Company of Texas 34,490 pounds of battery lead scrap. Subsequently, the defendants were paid $4,045.68 for this load; the price received was $496.66 above the ceiling price in effect at the time of delivery.[5]

---

1. Defense Production Act of 1950, as amended, 64 Stat. 798, 50 U.S.C.A.Appendix, § 2105. See Executive Order 10161, 15 F.R. 6105, 50 U.S.C.A.Appendix, § 2071 note; Economic Stabilization Agency General Order No. 2, 16 F.R. 738; and, Ceiling Price Regulation Number 53, 16 F.R. 6381.

2. PX–2.

3. PX–3.

4. PX–4.

5. PX–5.

(5) On October 16, 1951, the defendants delivered to the Eagle-Picher Company of Texas 23,900 pounds of battery lead scrap. Subsequently, the defendants were paid $2,-815.42 for this load; the price received was $346.55 above the ceiling price in effect at the time of delivery.[6]

(6) On October 18, 1951, the defendants delivered to the Eagle-Picher Company of Texas 39,000 pounds of battery lead scrap. Subsequently, the defendants were paid $4,-426.50 for this load; the price received was $549.90 above the ceiling price in effect at the time of delivery.[7]

(7) On October 18, 1951, the defendants delivered to the Eagle-Picher Company of Texas 25,270 pounds of battery lead scrap. Subsequently, the defendants were paid $2,-842.88 for this load; the price received was $353.78 above the ceiling price in effect at the time of delivery.[8]

(8) On October 20, 1951, the defendants delivered to the Eagle-Picher Company of Texas 31,090 pounds of battery lead scrap. Subsequently, the defendants were paid $3,-575.35 for this load; the price received was $441.48 above the ceiling price in effect at the time of delivery.[9]

(9) The eight violations in the instant case were neither "willful nor the result of failure to take practicable precautions against the occurrence of the violation".

Section 405(a) of the Defense Production Act of 1950, as amended, provides:[10]

"It shall be unlawful, regardless of any obligation heretofore or hereafter entered into, for any person to *sell or deliver*, or in the regular course of business or trade to buy or receive, any material or service, or otherwise to do or omit to do any act, in violation of this title or of any regulation, order, or requirement issued thereunder, or to offer, solicit, attempt or agree to do any of the foregoing." (Emphasis supplied.)

■ The Court is satisfied in regard to the six transactions in controversy that technically no sale for $0.19 per pound took place, as commonly understood under the law of sales, prior to the date the ceiling price for scrap lead was raised to $0.19 per pound. However, regardless of the defendants' contention that a mere bailment took place, under the admitted facts unquestionably a *delivery* occurred; a plain reading of the statute indicates that such delivery constituted a violation.

In interpreting similar language used in the Emergency Price Control Act of 1942,[11] Judge Huxman in Schreffler v. Bowles said:[12]

"* * * The words 'sell and deliver' are not synonymous terms. They have separate and distinct meanings. It must be presumed that Congress used them according to their ordinary and usual accepted meaning and understanding. Otherwise there would have been no need to include them both in the Act."

As mentioned in Bowles v. Beucher, another case involving the Emergency Price Control Act of 1942:[13]

'bought and received. Thus under the act it is unlawful if one (1) buys a commodity in violation of the act and regulations or (2) receives a commodity in violation of the act and regulations. The commission of either one of these acts, alone, is unlawful. * * *'"

---

6. PX–6.

7. PX–7.

8. PX–8.

9. PX–9.

10. (Note 1, supra).

11. 50 U.S.C.A.Appendix, § 904(a).

12. 10 Cir., 1946, 153 F.2d 1, 3. An analogous situation wherein it was emphasized that each word must be given a separate meaning was dealt with in United States v. Lutz, 3 Cir., 1944, 142 F.2d 985, 990 when the Court said: "* * * The statute makes it unlawful 'to buy or receive'. The indictment charged the defendant with having

13. D.C.Mass.1944, 53 F.Supp. 984, 987. Also, see Bowles v. Ward, D.C.Pa.1946, 65 F.Supp. 880, 889 wherein the Court said: "The words which appear in Section 1340.201 of said Regulation 'no person who is a producer or a distributor shall sell, dispose of, buy or receive bituminous coal at prices higher than the maximum prices established' have distinct meanings. It must, therefore,

"It will be noted that the Administrator does not merely charge as the violation that the goods were 'sold', but also that the goods were 'delivered' in Massachusetts. It is fair to assume that the Administrator would not have used the term 'deliver' in the regulations promulgated under the act unless he intended to mean something beyond what a sale ordinarily means, that is, a transfer of property or title. * * * It is reasonable to assume, under the circumstances, that the term 'deliver' in the regulation has a meaning distinct from 'sale' and the term is used in its plain and natural sense—a transfer of possession. If it had no added significance it would be hardly necessary to employ it at all. * * *"

Although a provision, such as the one involved herein, which makes *delivery,* without a sale, a violation patently appears harsh, the underlying principle is sound. Otherwise, deliveries could regularly be made with an understanding between the parties that the sales were not to be consummated until such time as the ceiling price was increased. The materials would flow in commerce, the inflationary tendency would not be curbed and the entire purpose and effect of the Price Control Act would be circumvented. Congress in dealing with the many problems involved in our post-war economy deemed it advisable to prohibit the sale or delivery of any commodity at an ultimate price which was in excess of that established by the Office of Price Stabilization at the time of said sale or delivery. Here, admittedly the defendants ultimately received a price for their

goods which was higher than the price permitted by the governing regulation at the time the actual delivery took place; such constitutes a violation.

 Inasmuch as the "violation of the regulation or order in question was neither willful nor the result of failure to take practicable precautions against the occurrence of the violation" the Government is only entitled to recover $3,749.32, the actual amount of the overcharges.[14]

Counsel should submit an appropriate journal entry within ten days.

---

be presumed that Congress, in enacting said statute making it unlawful to sell or deliver in violation of the price schedule which applied to coal, *used such words according to their ordinary and usually accepted meaning.* [Citing case.]" (Emphasis supplied.)

14. 50 U.S.C.A.Appendix, § 2109(c) provides in part: " * * * In any action under this subsection, the seller shall be liable for reasonable attorney's fees and costs as determined by the court, plus whichever of the following sums is greater: (1) such amount not more than three times the amount of the over-

charge, or the overcharges, upon which the action is based as the court in its discretion may determine, or (2) an amount not less than $25 nor more than $50 as the court in its discretion may determine: *Provided, however, That such amount shall be the amount of the overcharge or overcharges if the, defendant proves that the violation of the regulation or order in question was neither willful nor the result of failure to take practicable precautions against the occurrence of the violation.* * * *" (Emphasis supplied.)